691 A.2d 233

**Justin BELL**

v.

**STATE of Maryland.**

**No. 637, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

March 26, 1997.

Stephen L. Prevas, Baltimore, for Appellant.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief), for Appellee.

Submitted before DAVIS, HARRELL and HOLLANDER, JJ.

HOLLANDER, Judge.

On June 23, 1995, Justin Bell, appellant, shot and killed Bryan Maxwell and seriously wounded the victim's brother, Christopher Maxwell. The central issue at appellant's trial was whether appellant acted in self-defense. A jury in the Circuit Court for Baltimore County convicted appellant of manslaughter and attempted first degree murder, as well as use of a handgun in the commission of each of those crimes; appellant was sentenced to a total of 25 years in prison. Five questions, which we have rephrased slightly, are presented on appeal:

I. Did the trial court err in permitting the State to cross-examine appellant by referring to statements made by a witness the State knew was unavailable to testify at trial?

II. Did the trial court err in admitting improper opinion evidence?

III. Did the trial court err in precluding the admission of evidence of the prior conduct of the murder victim?

IV. Did the trial court err in precluding appellant from impeaching the attempted murder victim with a prior conviction?

V. Did the trial court err in precluding appellant from impeaching the attempted murder victim with evidence of a prior bad act?

We answer the first question in the affirmative. Accordingly, we shall reverse and remand for a new trial. For the guidance of the court on remand, we shall briefly address the remaining issues.

### Factual Summary

The events in issue occurred at approximately 2:00 a.m., in the vicinity of a shopping center and a Meineke parking lot

located in Parkville. Christopher Maxwell was the State's principal witness.[1]

On the evening of June 22, 1995, Justin Bell, who was then 19 years old, went to the Friendly's Restaurant located on Harford Road in Baltimore County to meet his friend, Cory Tart, who was an employee of the restaurant. After the restaurant closed, appellant remained in the parking lot, talking with Tart, Joey Buckler, and Danny Dimena.[2] The group left Friendly's at about 1:30 a.m. and walked to a nearby 7–Eleven store. After purchasing some food, Dimena left the group to go home; appellant, Tart, and Buckler walked northbound along Harford Road.

Christopher, who was 19 years old at the relevant time, and Bryan, who was then 20 years of age, had spent the evening at a bar, where Christopher consumed five or six beers. Christopher acknowledged that he previously had problems with alcohol. According to the autopsy report, Bryan was legally intoxicated at the time of death; Christopher conceded that Bryan drank "a lot." The Maxwells left the bar at about 2:00 a.m., in Bryan's car. They soon passed a group of three men, later identified as appellant, Tart, and Buckler, walking along Harford Road. An unidentified object then hit Bryan's car.

Bryan, who was driving, became upset and drove back to the area where he and Christopher had seen the three men. After pulling onto a side street, Bryan directed Christopher to run after the "three boys" and "keep" them until Bryan could park the vehicle and arrive at the area. Before leaving the car, Christopher put a tire iron in the waistband area of his pants.[3] When Christopher caught up with the three men, he

---

1. At the time of trial, Christopher was incarcerated on an unrelated matter.

2. At trial, Joey Buckler was also referred to as Joey Buttner. The transcript notes that "Dimena" has been spelled phonetically; in his brief, appellant refers to him as "Domena."

3. The police later recovered from the scene a 9 inch combination automobile lug wrench and tire iron.

was "cussing" and "yelling" and asked them if they had a "beef." The men denied this and Christopher told them not to "play [him] for a fool."

According to Christopher, Bryan arrived within seconds. Christopher asked him, "which one was it?" Bryan identified appellant and stepped toward him. Christopher testified that before Bryan could say or do anything, and when he was within three feet of appellant, Buckler told Bell, "you better go ahead and use it." Christopher claimed that appellant produced a gun and shot Bryan, who nonetheless remained standing. Christopher acknowledged in his testimony that Bryan would have charged at anyone who pointed a gun at him. At that point, Christopher claimed he told appellant that he was not afraid of his "little BB gun." Appellant pointed the gun at Christopher, while he and his friends "backed up the sidewalk...." Christopher picked up a nearby picnic bench and threw it at appellant, intending to "distract them so I could get them or make him use up the bullets so I could get to him or so my brother wouldn't get shot again." As Christopher threw the bench, appellant fired once, and missed. Christopher took the tire iron from his waistband and threw it at appellant while running away. According to Christopher, as he tried to run, appellant fired several shots, hitting him in the back and elbow.[4]

The State called two other witnesses who observed portions of the occurrence. Clifford Posey was driving a co-worker home when he passed the scene. He testified that he saw three men facing two others. One of the three was holding a gun, and one of the two picked up a bench. He heard four to five shots and, in his rear view mirror, saw one of the men fall. John Shinners was sitting in his van in the parking lot of a shopping center across the street when he heard a gunshot. He saw four men, one of whom was facing three others. He also heard shouting and a man said, "What the fuck did you do that for?" Two men started walking away and another man

---

4. As a result of the wounds he received, Christopher is paralyzed from his waist down.

threw a picnic bench at one of them. The man at whom the bench was thrown turned around and fired four shots. Then, the three men ran away. Over defense objection, both witnesses were permitted to state that they observed nothing prior to the firing of the shots that indicated appellant was facing imminent danger of death or serious bodily harm.

Appellant testified in his own defense. He denied that he or his friends threw anything at a passing vehicle. He explained that as he, Buckler, and Tart were walking north on Harford Road, a car drove slowly past them, travelling in the opposite direction, with its windows partially lowered and the occupants staring at them. After the vehicle passed, it made a U-turn and came back towards them, pulling into a side street and parking. Feeling "paranoid," he urged his friends to jog to escape. Christopher appeared "from around the corner" in front of the three men, screaming and hollering; Bryan came up behind them shortly thereafter. Appellant and his friends tried to back away and assure the Maxwells that they had no quarrel with them. Christopher spit at Joey and said, "Fuck this, and I'm tired of fucking around. Just give us your shit."

Appellant claimed that he thought both brothers had weapons. Before appellant shot anyone, he stated that the Maxwells both gestured at their waistbands. Appellant pulled out his gun,[5] pointed it at the ground, and told the Maxwells that he and his friends were leaving. Bryan lunged at him, saying, "Fuck that. · You pulled out that gun and you better use it." When Bryan lunged at Bell, appellant shot him in the chest because he was "scared." Appellant stated, on cross-examination, that he shot Bryan "because as he was gesturing [towards his waist] and after I had already pulled the gun, he came after me." After Bell shot Bryan, he urged him to see a doctor. Bryan replied, "Fuck that. I'm not hurt."

Appellant further testified that he and his friends began to retreat. Christopher was shouting and said that he, too, had a

_____

5. Appellant explained that he carried a gun for his own protection, because he had previously been threatened and accosted.

gun, and that his gun was bigger. According to appellant, after Christopher threw a nearby picnic bench at appellant and his friends, Christopher pulled something from his waistband. Thinking that Christopher was about to produce a gun and shoot him, appellant fired several times. The three men then fled to Cory's house, where appellant cleaned the gun, vomited, and went to sleep. The next day, he told Cory and Joey not to discuss what happened or brag about it. He put the gun in a plastic bag and, on his way to work, he threw it into some bushes.

Tart's testimony was essentially consistent with appellant's version of the incident. Tart explained that Christopher was yelling and spit at Buckler. Although appellant told the Maxwells that the three had "no beef" with the brothers, and appellant and the others started to walk away, the Maxwells pursued them. When appellant pulled his gun, one of the Maxwells said: "If you pull it, you better use it." Appellant fired the weapon when Bryan jumped at him. Christopher had his hand on the side of his leg, stating "mine is bigger, mine is bigger." Bell fired again after the bench was thrown.

Three other witnesses testified for the defense concerning the Maxwell brothers' reputations for violent dispositions. Two of these witnesses were police officers and one was a friend of appellant.

Buckler did not appear at the trial. Both Tart and appellant testified, on direct and cross-examination, that they had tried to contact Buckler since the time of the incident, without success.

Additional facts will be included in our discussion of the issues presented.

## Discussion

### I.

During cross-examination of appellant, the State questioned him about Buckler's statement to the police. Appellant contends that this line of questioning was improper, because: 1) it placed before the jury hearsay evidence about the incident

from a witness who was not present at trial; 2) the State knew that Buckler would not be called as a witness; and 3) it violated appellant's rights under the Sixth Amendment's Confrontation Clause. The State counters that appellant's claim is without merit, because: 1) the prosecutor did not convey substantive evidence to the jury; 2) the prosecutor merely sought to impeach appellant and was not successful in showing any material contradictions; 3) Buckler's statement was generally consistent with Bell's testimony; and 4) the error, if any, was harmless. Because we are of the view that the court erred in permitting the State to question appellant about Buckler's statement to the police, we are compelled to reverse.[6] We explain.

At trial, the State repeatedly questioned appellant concerning Buckler's statement to the police. The following exchange is relevant:

[PROSECUTOR]: Would it surprise you that Joey Buckler said that you yelled out—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]:—to that car, "Fuck you pussies"?

[BELL]: Yes it would surprise me.

[DEFENSE COUNSEL]: Objection, Your Honor. Move to strike.

THE COURT: Overruled.

[PROSECUTOR]: Would it surprise you that Joey Buckler said in his written statement "They are coming. The car is coming"?

[DEFENSE COUNSEL]: Objection, Your Honor.

[PROSECUTOR]: And you said, "Don't worry"?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

---

6. We express no opinion as to whether either party would have been entitled to a "missing witness" instruction. Our concern is with the State's effort to place before the jury the substance of the statement of the missing witness.

[BELL]: Yes. It would not surprise me because he was saying that, the car was coming back up Harford Road.

\* \* \* \* \* \*

[PROSECUTOR]: And so if he [Buckler] said you yelled at the car, "Fuck you pussies"—

[BELL]: He is incorrect.

\* \* \* \* \* \*

[PROSECUTOR]: Would it surprise you that no where [sic] does Joey Buckler say anything about a robbery—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]:—In his written statement. Does it surprise you that Joey Buckler never says anything about a robbery in his written statement?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[BELL]: Maybe it would.

[PROSECUTOR]: It would surprise you?

[BELL]: Yes.

[PROSECUTOR]: How about this one that when you get back to the house, Cory Tart's house, after you have shot Chris and Bryan Maxwell you say "Those bitches aren't going to be calling us bitches anymore"?

[BELL]: I never said that.

[PROSECUTOR]: You never said that?

[BELL]: Never said that.

[PROSECUTOR]: Next morning, would it surprise you in his written statement Joey Buckler says you said, "We all are the only ones who know about it. And if this gets out, you guys will get it"?

[BELL]: I never said that. I wouldn't threaten Cory or Joey. They are my friends.[7]

■ Maryland Rule 5–801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The admission of hearsay is barred by Maryland Rule 5–802, unless it is admissible under another provision of the rules or "by applicable constitutional provisions or statutes...."[8] Buckler's statement constitutes textbook hearsay. In spite of the State's protests to the contrary, it is clear that the State sought to use Buckler's statement to prove the truth of the matters asserted.

The hearsay rule is grounded on principles of fairness. Lynn McLain, MARYLAND EVIDENCE, § 801.1, at 269 (1987). At least some of the value of Buckler's oral statement depended on his credibility. McLain, *supra*, § 801.1, at 271. But the defense was completely unable to challenge the declarant, because he did not appear. It is intrinsically inconsistent for the State to suggest, on the one hand, that it was not presenting Buckler's statement as an accurate account, while simultaneously suggesting that it merely sought to show that appellant's version of events was incorrect and, therefore, that appellant was not credible.

Our inquiry does not end with our conclusion that the statement constituted hearsay. We next consider whether the statement was properly used based on an applicable hearsay exception. The State has not suggested an applicable. exception, and we can find none.

Maryland Rule 5–804 establishes five exceptions to the hearsay rule when a declarant is unavailable. These are

---

7. Outside the presence of the jury, defense counsel reiterated to the court that the exchange between the prosecutor and Bell regarding Buckler's statement was "inappropriate."

8. Maryland Rule 5–104(a) provides that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court...."

former testimony, statement under belief of impending death, statement against interest, statement of personal or family history, and "Other exceptions."

The threshold inquiry under Rule 5–804 concerns the unavailability of the witness.[9] In order to satisfy the unavailability component, "the prosecutorial authorities [must make] a good-faith effort to obtain [the witness's] presence at trial." *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). *See also Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980).

The case of *State v. Breeden,* 333 Md. 212, 634 A.2d 464 (1993), is instructive. There, the defendant pled guilty to second degree murder and also entered a plea of not criminally responsible by reason of insanity. Although the trial court found Breeden criminally responsible, we remanded the case for retrial on that issue. On retrial, Breeden was found criminally responsible. The Court of Appeals then considered whether the trial court abused its discretion by receiving in evidence at the second trial the transcribed testimony of a witness who testified at the first trial but who did not appear at the second trial. The Court determined that the State had failed in its burden to make a reasonable and diligent effort to produce the witness. *Id.* at 227, 634 A.2d 464. Consequently, it concluded that the trial court should not have allowed the State to use the witness's previous testimony and, by allowing it to do so, the trial court deprived the defendant of his right of confrontation. The Court explained, at 333 Md. at 222, 634 A.2d 464:

> [T]he "unavailability" of a material witness includes one who is absent from a trial and the proponent of the statement of the witness has been unable to procure the witness's attend-

---

9. Rule 5–804 states, in pertinent part:

 (a) **Definition of Unavailability.** "Unavailability as a witness" includes situations in which the declarant:

 \* \* \* \* \* \*

 (5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance ... by process or other reasonable means.

ance by process or other reasonable means. "Other reasonable means" require efforts in good faith and due diligence to procure attendance. If the declarant is so unavailable as a witness, former testimony bearing the indicia of reliability, given as a witness at another hearing of the same or a different proceeding, may be admissible if the party against whom the testimony is now offered had an opportunity to cross-examine the witness.

*Breeden* compels our conclusion that unavailability was not established, because the State failed altogether to demonstrate any effort to procure Buckler's presence at trial. The record reflects that the defense initially probed the matter of Buckler's absence during the direct examination of both appellant and Tart.[10] During cross-examination of appellant, the

---

10. On direct examination of Tart by defense counsel, the following exchange occurred:

[DEFENSE COUNSEL]: When is the last time you saw Joey Buckler?
[TART]: About two or three months ago.
[DEFENSE COUNSEL]: And do you know where he is now?
[TART]: No, I don't.
[DEFENSE COUNSEL]: Have you ever tried to find him?
[TART]: Yes, I have.

\*　\*　\*　\*　\*　\*

[DEFENSE COUNSEL]: Does he have family in another state?
[TART]: Yes.
[DEFENSE COUNSEL]: Where?
[TART]: Maine.

\*　\*　\*　\*　\*　\*

[DEFENSE COUNSEL]: But you haven't seen him?
[TART]: I haven't seen him or heard from him.

Appellant also denied knowledge of Buckler's whereabouts:

[DEFENSE COUNSEL]: ... Do you know where Joey Buckler is now?
[BELL]: Not at this time, I do not.
[DEFENSE COUNSEL]: When was the last time you have seen him?
[BELL]: Maybe two and a half months ago.
[DEFENSE COUNSEL]: Have you tried to get in touch with Joey Buckler?
[BELL]: Several times.

\*　\*　\*　\*　\*　\*

[DEFENSE COUNSEL]: Has he tried to contact you in any way, shape, or form?
[BELL]: Not at all.

prosecution then pursued the issue of Buckler's absence, as illustrated in the following exchange:

[PROSECUTOR]: ... And you have spoken with Joey [Buckler] up until, what is it, two months ago you say?

[BELL]: Two, two and a half months.

[PROSECUTOR]: In that time you told him I will need you for trial?

[BELL]: He was already well aware that he was going to be here for trial.

[PROSECUTOR]: He just took off?

[BELL]: Yes, he did.

[PROSECUTOR]: Not here for you?

[BELL]: No, he's not.[ [11] ]

---

11. During the cross-examination of Tart, the State also pursued the issue of Buckler's absence:

[PROSECUTOR]: Do you remember meeting with Mr. Woolman and me on the 17th of January?
[TART]: Yes.
[PROSECUTOR]: Do you remember at that time you said Joey Buckler was in Maine, that he had a baby in Maine and that he had returned to Maine?
[TART]: Yes. He returned to Maine.
[PROSECUTOR]: So when you said you didn't know where he was, that is not true. You know he is in Maine.
[TART]: I don't know if he is in Maine. He could be.
[PROSECUTOR]: Do you recall that Mr. Woolman and myself asked you to get in touch with Joey Buckler so we could talk to him?
[TART]: I tried.
[PROSECUTOR]: Do you remember we asked you that?
[TART]: Yes.
[PROSECUTOR]: Do you remember that you said that you could get in touch with him, but you would want to speak to Mr. Bell's attorney first?
[TART]: Yes.

 \* \* \* \* \* \*

[PROSECUTOR]: You have been in touch with Mr. Buckler's sister, is that your testimony here?
[TART]: Yes.

 \* \* \* \* \* \*

[PROSECUTOR]: Well, did it occur to you to leave word with Joey's sister when Joey calls in that we need him?
[TART]: I did.

 \* \* \* \* \* \*

[PROSECUTOR]: And tell her, "We need Joey, leave word"?

The State's failure to satisfy the unavailability requirement is not the State's only dereliction. Even assuming unavailability, the State does not contend that Buckler's statement was one that was against his interest. Maryland Rule 5–804(b)(3). Nor does it suggest that Buckler's statement constituted "former testimony."[12] Maryland Rule 5–804(b)(1). None of the other exceptions in Rule 5–804(b) seems remotely applicable.

In *Breeden*, the Court addressed the requirements of the former testimony exception. The Court said: "If the declarant is so unavailable as a witness, former testimony bearing the indicia of reliability, given as a witness at another hearing of the same or a different proceeding, may be admissible if the party against whom the testimony is now offered had an opportunity to cross-examine the witness." *Breeden*, 333 Md. at 222, 634 A.2d 464. Similarly, the recent case of *Tyler v. State*, 342 Md. 766, 774, 679 A.2d 1127 (1996), makes clear that the admission of prior testimony is allowed when "(1) the witness has given testimony under oath; (2) the witness . . . is unavailable to testify; and (3) the accused had an opportunity to cross-examine the witness at the prior trial or hearing where the testimony was elicited." Under such circumstances, neither the Constitution's Confrontation Clause nor the rules of evidence are offended. Thus, the State did not comply with the requirements of *Breeden*, *Tyler*, or Maryland Rule 5–804.

The case of *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993), is also noteworthy to highlight what this case is *not*

---

[TART]: (Whereupon, the witness nodded.)

12. Rule 5–804 provides, in part:

(b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former Testimony.* Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

about. In *Nance,* the witnesses to a murder testified at trial and recanted their prior written statements, which had been provided to the police and the grand jury. Over defense objection, the trial judge admitted the witnesses' police statements and their grand jury testimony for impeachment purposes. Nance was subsequently convicted of first-degree murder.

On appeal, the Court held, with regard to the statements made by the witnesses to police, that when such statements are based on the declarant's personal knowledge, reduced to writing, and signed or otherwise adopted by the witness, *and* the witness is present and thus subject to cross-examination, the factual portion of the out-of-court statement is sufficiently trustworthy as substantive evidence. *Nance,* 331 Md. at 569, 629 A.2d 633. The Court further held that the grand jury testimony was properly admitted as substantive evidence, because such testimony was given "in an atmosphere of formality impressing upon the declarant the need for accuracy...." *Id.* at 571, 629 A.2d 633. The Court emphasized, however, that the witness *must* be present at trial to be "tested by cross-examination in regard to the former grand jury appearance and its contents." *Id.* Here, the State proffered neither a signed statement of Buckler nor grand jury testimony. Perhaps most important, Buckler was not present at trial. *Nance,* therefore, is totally inapposite. *See also* Md. Rule 5–802.1(a).

Even if no hearsay exception applies here, the State claims no error was committed because it merely referred to Buckler's statement in its cross-examination of Bell, in order to suggest that there was evidence contrary to Bell's account of the occurrence. It urges that because the statement itself was not introduced into evidence, nor quoted directly by the prosecution, it was not misused. In our view, these arguments miss the point by a wide margin. While the State did not formally offer the statement, it appeared to quote the statement when it posed its questions. It thus succeeded in placing before the jury the apparent content of Buckler's statement.

In her instructions to the jury, the court told the jury that it could consider testimony from the witness stand. The court advised the jury to "consider the evidence in this case. *That is testimony from the witness stand,* physical evidence or exhibits admitted into evidence, and stipulations." (Emphasis added). The Court, of course, also told the jury that the questions of counsel are not evidence. But appellant's testimony was based on the prosecutor's questions; his answers could not be evaluated in a vacuum.

In this regard, the case of *Hagez v. State,* 110 Md.App. 194, 676 A.2d 992 (1996), is helpful. There, we reversed a murder conviction because of the State's repeated, persistent, testimonial-like questions propounded to a witness who invoked, perhaps wrongfully, her spousal privilege not to testify. Here, as in *Hagez,* the State "attempted to place before the jury evidence that it was otherwise unable to present and to construct its case from inferences derived from its own questions." *Id.* at 222, 676 A.2d 992. What we said in *Hagez* is apt here: "The question itself is damning; the answer is almost irrelevant." *Id.* at 221, 676 A.2d 992. Moreover, because the State's questions in *Hagez* were "tantamount to prosecutorial testimony" and were "unrelenting," *id.,* it was of no moment to us that Ms. Hagez did not even answer the questions and did not necessarily have the right to assert a spousal privilege.

The State argues that its use of Buckler's statement was proper, because it was merely for the purpose of impeaching Bell's credibility. Statements that are otherwise inadmissible are not salvaged by invoking the mantra of "impeachment." If the State could not properly use the statement under the applicable rules of evidence, we fail to see how it could, instead, read the statement to the jury, apparently line by line, through the questions it posed to the defendant.

Unquestionably, a party may attempt to impeach a witness by challenging his or her credibility. *See generally,* Lynn McLain, MARYLAND EVIDENCE, § 607 (1987); Maryland Rule 5–607. But impeachment must be consistent with the

common law and the rules of evidence. For example, evidence may be introduced as to the witness's character for truthfulness. Maryland Rule 5–608. A witness's credibility may also be called into question by evidence of certain prior crimes, bad acts, or other conduct probative of veracity. Maryland Rules 5–608(b); 5–609. Additionally, prior inconsistent statements of the witness may be examined with a view towards challenging the witness's veracity. Maryland Rules 5–613; 5–616. Moreover, Maryland Rule 5–616 permits, *inter alia*, impeachment by questioning of the witness directed toward "proving that the facts are not as testified to by the witness" or by showing bias, prejudice, motive to testify falsely, or lack of knowledge. In appropriate circumstances, extrinsic evidence may also be introduced to impeach the witness's credibility. Maryland Rule 5–616(b). "Evidence proved through another witness ... is extrinsic evidence. The admissibility of extrinsic evidence which is offered for substantive purposes is governed by all the usual rules of evidence: no special rule applies when the evidence has the incidental effect of discrediting a witness' testimony." McLain, *supra*, § 607.4, at 50. Yet the State has not referred us to any authority to support its claim that it was entitled to impeach the defendant with the hearsay statement of a material eyewitness who was not present at trial, whose unavailability was not established, and whose oral statement was neither tested in another proceeding, proffered as a sworn statement, nor adopted by the declarant.

In reaching our conclusion that the State cannot hide under the guise of impeachment, we find persuasive the case of *Snyder v. State,* 104 Md.App. 533, 657 A.2d 342 (1995). There, the defendant was convicted in 1993 of the murder of his wife, which occurred in 1986. We reviewed the trial court's admission of the testimony of a police detective that consisted, in part, of questions that the detective had wanted to ask the accused during the week following the murder. We determined that the detective's list of unasked questions improperly gave the jury the impression that the detective did not believe Snyder. We said:

"There is no doubt that the challenged comments of the police which were heard by the jury, whether in the form of questions, assertions of disbelief, opinions (not as expert witnesses), argument, *recounting of what others were purported to have said contrary to the version of the accused,* hearsay, or otherwise, tended to seriously prejudice the defense."

*Snyder,* 104 Md.App. at 553–54, 657 A.2d 342 (quoting *Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244 (1979)) (emphasis added).

We also cannot agree with the State's assertion that no error occurred because no substantive evidence was presented and Buckler's statement did not contradict Bell's testimony. A comparison of Bell's testimony during direct and cross-examination reveals that the State was, indeed, allowed to use hearsay evidence from an absent eyewitness that contradicted Bell on at least two substantive points. The following colloquy, during Bell's direct examination, concerned the instigation of the confrontation:

[DEFENSE COUNSEL]: Now, while you were in the parking lot [of the 7–Eleven], were there any problems or any arguments or any disruptions or anything of that nature?

[BELL]: No, none at all.

[DEFENSE COUNSEL]: Did any of your group yell at anybody or throw anything or try to disturb anybody?

[BELL]: No.

[DEFENSE COUNSEL]: Did you throw anything at a car?

[BELL]: No, I did not.

Yet, as we already noted, on cross-examination the State asked Bell:

[PROSECUTOR]: Would it surprise you that Joey Buckler said that you yelled out—

\* \* \* \* \* \*

[PROSECUTOR]: —to that car [referring to the Maxwell brothers' car], "Fuck you pussies?"

[BELL]: Yes, it would surprise me.

The second substantive issue for which the State used Buckler's statement pertained to Bell's perception of the confrontation with the Maxwells as an attempted robbery. On direct examination, Bell testified that Christopher said, "Fuck this, and I'm tired of fucking around. Just give us your shit." On cross-examination, appellant asserted that he had told the police that he thought the Maxwells were going to rob him and his friends. The State produced the police version of an interview with Bell, which he neither signed nor adopted, and noted that there was no mention of a robbery attempt. The State also used Buckler's hearsay statement to contradict Bell's claim of a robbery:

[PROSECUTOR]: Would it surprise you that nowhere does Joey Buckler say anything about a robbery—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]: —in his written statement. Does it surprise you that Joey Buckler never says anything about a robbery in his written statement?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[BELL]: Maybe it would.

[PROSECUTOR]: It would surprise you?

[BELL]: Yes.

■ The trial court's error in allowing the State indirectly to present Buckler's hearsay statement resulted in a violation of appellant's constitutional right to confront an important witness.[13] The right to a fair trial is, at its core, the right of

---

**13.** Relying on *White v. State*, 324 Md. 626, 640, 598 A.2d 187 (1991), the State argues that appellant's confrontation argument is not preserved, because he did not present it to the trial court. *White* is inapposite here. When a party asserts specific grounds for an objection, even if not asked to do so by the court, the party is then limited to

an accused to defend against the State's accusations. The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees a defendant in a criminal case the right to confront his or her accusers. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (extending Sixth Amendment confrontation right to states through Fourteenth Amendment); *State v. Gray,* 344 Md. 417, 687 A.2d 660 (1997). Justice Black, in delivering the *Pointer* opinion, stated:

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

*Pointer,* 380 U.S. at 405, 85 S.Ct. at 1068. *See Barber,* 390 U.S. at 721, 88 S.Ct. at 1320; *Gray,* 344 Md. at 420, 687 A.2d 660; *Smallwood v. State,* 320 Md. 300, 306, 577 A.2d 356 (1990). The right of confrontation is also guaranteed by Article 21 of the Maryland Declaration of Rights. *Chapman v. State,* 331 Md. 448, 450, 628 A.2d 676 (1993); *State v. Collins,* 265 Md. 70, 73, 288 A.2d 163 (1972).

The right to confrontation is protected through the opportunity to challenge a witness by cross-examination. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Gray,* 344 Md. at 420, 687 A.2d 660. In both *Pointer* and *Chambers,* the Supreme Court recognized that, by denying an accused in a criminal case the opportunity to cross-examine those who offer inculpatory evidence, the defendant is

---

the particular grounds asserted. *Brecker v. State,* 304 Md. 36, 40, 497 A.2d 479 (1985). Maryland Rule 4–323(a), however, specifically states that the "grounds for the objection need not be stated unless the court ... so directs." Here, despite appellant's frequent objections, he was never asked to provide any specific basis for his objection. Thus, appellant has not waived his confrontation argument.

denied the fundamental constitutional guarantee of a fair trial. Similarly, the Court of Appeals has recognized that in all criminal prosecutions in this State " '[t]he prerogative of the defendant to have his accusers confront him is a keystone to our concept of criminal justice—grounded on the unwavering belief that an individual should be afforded the opportunity to challenge the witnesses against him through cross-examination.' " *Breeden,* 333 Md. at 219, 634 A.2d 464 (quoting *State v. Collins,* 265 Md. 70, 76, 288 A.2d 163 (1972)).

■ We recognize that the right of confrontation does not compel the exclusion of all hearsay evidence. McLain, *supra,* § 801.1, at 272. *See, e.g., Ebb v. State,* 341 Md. 578, 671 A.2d 974 (1996) (stating that the right of confrontation does not require the court to permit cross examination that is merely repetitive or marginally relevant). *See also White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (eliminating requirement for either the production of declarant at trial or a trial court finding of unavailability as precondition for admitting medical examination or spontaneous declaration hearsay evidence); *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (stating that testimony from witnesses describing the out-of-court statements of a 3 year old victim whom the court found could not communicate to the jury did not constitute a *per se* violation of the Confrontation Clause); *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (eliminating requirement to show unavailability as a condition for the admission of out-of-court statement of a nontestifying co-conspirator). These and other cases, however, have not altered the fundamental principle that hearsay ordinarily must satisfy a "firmly rooted exception," so as not to offend the Confrontation Clause. McLain, *supra,* § 801.1, at 272. The right of confrontation affords an accused the opportunity to challenge the testimony of adverse witnesses. Therefore, hearsay evidence may be admitted against the accused only under specifically delineated circumstances, which are not applicable here.

We also observe that the instant matter is readily distinguishable from the recent case of *State v. Gray*, 344 Md. 417, 687 A.2d 660 (1997). There, the Court considered whether the defendant's Sixth Amendment confrontation right was violated by the admission in evidence of a non-testifying codefendant's confession, when the confession was redacted to exclude the names of all those the confessor said were involved in the crime *and* the trial court carefully instructed the jury that the confession could only be considered against the confessor. *Id.* at 418, 687 A.2d 660. The Court determined that the admission of the redacted confession did not violate the Confrontation Clause or *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); a violation only "occurs when a codefendant's confession, either facially, or by compelling and inevitable inference, inculpates a nonconfessing defendant. Under those circumstances, there *is* a substantial risk that the jury will not heed the trial court's instructions to disregard the confession as evidence against the nonconfessing defendant...." *Id.* at 433, 687 A.2d 660. Although the jury "*could have* reasonably inferred" that Gray was one whose name had been deleted from his codefendant's confession, the Court reasoned that such an inference was not "compelled." *Id.* at 432, 687 A.2d 660. The trial court's instruction to the jury that it could not use the confession as evidence against Gray, coupled with the presumption that juries follow the court's instructions, led the Court to conclude that Gray's confrontation right was adequately protected and *Bruton* was not violated. *Id.* at 433–34, 687 A.2d 660.

In contrast, the jury here was never cautioned with regard to the State's use of Buckler's statement; even if the State meant to use it only for impeachment purposes, and not for its substantive value, the jury was never so advised. It is also significant that, in *Gray*, the statement of the nontestifying codefendant-confessor was admissible as a voluntary statement of a party-opponent. *See* Md. Rule 5–803. Buckler, however, was not a party to this case. *Cf. Holcomb v. State*, 307 Md. 457, 515 A.2d 213 (1986) (stating that rules of

evidence that apply to memoranda generally also apply to a memorandum of an oral confession).

We are left with the State's contention that the error, if any, was harmless. In *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976), the Court reversed Dorsey's conviction for armed robbery and assault because the trial judge admitted into evidence, over defense objection, a police officer's testimony that a high percentage of that officer's arrests resulted in convictions. The Court said, at 276 Md. at 659, 350 A.2d 665:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

We cannot declare such a belief.

Again, *Snyder* is instructive. There, we also could not conclude, beyond a reasonable doubt, that the officer's testimony regarding the questions he had intended to ask the accused did not contribute to the defendant's guilty verdict. We stated: " 'The nature of the objectionable matter, the [presentation] of it before the jury, and its direct adverse relation to the defense of the accused, lead inescapably to this conclusion [that the error is not harmless].' " *Snyder,* 104 Md.App. at 554, 657 A.2d 342 (quoting *Crawford v. State*, 285 Md. 431, 455, 404 A.2d 244 (1979)). We recognized that "[t]he admission into evidence of those questions 'clearly brought out the obvious disbelief of the police in [appellant's] version of what happened.' " *Id.* (quoting *Crawford v. State*, 285 Md. 431, 447, 404 A.2d 244 (1979)). *Cf. Allen v. State,* 318 Md. 166, 567 A.2d 118 (1989).

The defense concedes that Bell killed Bryan and shot and wounded Christopher. Self-defense was, however, hotly contested. State of mind, which is an integral part of the defenses of perfect and imperfect self-defense, can rarely be proved directly. Thus, Bell's credibility was a particularly

crucial component of his defense.[14] Yet, the State was allowed to impugn appellant's version of the occurrence with a not-so-veiled attempt to put before the jury the out-of-court statement of an absent eyewitness. That the statement was not conflicting in all respects is of no moment. The impropriety was made worse because the jury knew the conflicting statement was made by Bell's own friend, who was at the scene of the shooting, and the State at least implicitly sought to suggest that Buckler's failure to appear at trial was a consequence of Bell's threats. The jury thus could have inferred that, if Buckler's testimony were exculpatory, he would not have been threatened and he would have appeared at trial.

The State vigorously asserts that the evidence against Bell is "overwhelming," although it concedes that it was the jury's task to assess appellant's state of mind when he fired the shots. As we see it, the evidence was "overwhelming" that appellant shot the Maxwell brothers, but the evidence as to appellant's state of mind was anything but that. Consequently, the State's ability to enter through the proverbial back door a hearsay statement that it surely could not offer through the front door was significant. Applying the *Dorsey* test, we cannot say, beyond a reasonable doubt, that the

---

14. The requirements for perfect self-defense include that the defendant "must have had reasonable grounds to believe, and have in fact believed, himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant." *Guerriero v. State,* 213 Md. 545, 549, 132 A.2d 466 (1957). *Accord State v. Martin,* 329 Md. 351, 357, 619 A.2d 992, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Rajnic v. State,* 106 Md.App. 286, 292, 664 A.2d 432 (1995). Pursuant to an objective test, the defendant's "belief must coincide with that which would have been entertained under the same circumstances by a person of average prudence." *Guerriero,* 213 Md. at 549, 132 A.2d 466. Additionally, the accused asserting self-defense must not have provoked the conflict at the deadly force level, and the force used must not have been excessive under the circumstances. *Rajnic,* 106 Md.App. at 292, 664 A.2d 432. If " 'the defendant honestly believed that the use of [deadly] force was necessary but … this subjective belief was unreasonable under the circumstances,' " then imperfect self-defense is established, which would support a voluntary manslaughter conviction. *Dykes v. State,* 319 Md. 206, 213, 571 A.2d 1251 (1990) (quoting *State v. Faulkner,* 301 Md. 482, 501, 483 A.2d 759 (1984)).

misuse of Buckler's statement did not influence the jury in its assessment of the evidence.

The words of Judge Moylan, writing for the Court in *Zemo v. State,* 101 Md.App. 303, 306, 646 A.2d 1050 (1994), albeit in a different context, seem particularly apt here:

> A few smudges of prejudice here and there can be found almost universally in any trial and need to be assessed with a cool eye and realistic balance rather than with the fastidious over-sensitivity or feigned horror that sometimes characterizes defense protestations at every angry glance. We are not talking about the expected cuts and bruises of combat. What we are objecting to in this case, rather, is a sustained and deliberate line of inquiry that can have had no other purpose than to put before the jury an entire body of information that was none of the jury's business. We are not talking about a few allusive references or testimonial lapses that may technically have been improper. We are talking about the central thrust of an entire line of inquiry. There is a qualitative difference. Where we might be inclined to overlook an arguably ill-advised random skirmish, we are not disposed to overlook a sustained campaign.

*See also Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) ("In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against [the defendant] had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached." [Citations omitted] ).

In view of our decision to remand for a new trial, we shall briefly address the remaining issues.

## II.

The State called two independent witnesses, Clifford Posey and John Shinners, who testified that they observed parts of the confrontation between appellant and the Maxwell brothers in the early morning hours of June 23, 1995. Appellant argues that the trial court erred because it improperly admit-

ted the opinion testimony of these witnesses on matters relating to the ultimate issue in the case—appellant's state of mind.

Posey testified that he "saw three white males on the Meinke[15] parking lot. One of the males was holding a gun on the other two." He passed the man with the gun and heard four or five shots. In his rear view mirror, he saw one of the men fall. Posey provided additional detail about the positions of the men and their movements and stated that the street lights were adequate for his observations. Posey also testified that he saw one of the men "pick a bench up, raise it over his head and throw the bench." During the State's direct examination, the following exchange occurred:

[PROSECUTOR]: During the period of time when you saw the shooting take place, did you see the two that were facing northbound [Bryan and Christopher Maxwell] do anything that appeared that there was an imminent threat of death to happen to the person standing here [Appellant]?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[POSEY]: No.

[PROSECUTOR]: Did you see them do anything that indicated to you based upon your observation that there was imminent threat of serious bodily harm going to happen to the person standing here (Indicating)?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled

[POSEY]: The person with the gun?

[PROSECUTOR]: Yes.

[POSEY]: No.

Shinners testified that in the early morning hours of June 23, 1995, he was in his van in the middle of the parking lot of the Parkville Shopping Center, facing Harford Road, about

---

15. During the testimony of Posey and Shinners, the Meineke muffler shop appears as "Meinke."

one hundred to one hundred-fifty yards from the Meineke parking lot. Shinners's attention was drawn to the Meineke lot when he heard a gunshot. At that point, he saw one male facing three males. After the gunshot, Shinners testified that the lone male exclaimed, "what the fuck did you do that for?" After more shouting, Shinners observed three males turn and walk away, and "the lone person picked up an object which later turned out to be a small picnic bench and raise[d] it above his head and threw it towards [appellant]. At that point [appellant] turned around and fired four shots in rapid succession." This colloquy ensued:

> [PROSECUTOR]: Prior to the four rapid succession of shots, did you see the lone man [Christopher Maxwell] do anything that indicated to you that the three were in imminent danger of death?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [SHINNERS]: No.
>
> [PROSECUTOR]: Did you see the lone man do anything to the three facing him or then later turning that indicated to you that he was, the lone man, was going to do anything to cause imminent serious bodily harm to the three?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [SHINNERS]: No.

To be sure, the State did not specifically couch its questions in the form of opinion questions. Nonetheless, "That which we call a rose By any other word would smell as sweet." William Shakespeare, ROMEO & JULIET act 2, sc. 2. Therefore, we must determine if the fact witnesses, who already testified extensively to what they actually observed, were entitled to offer their personal opinions about whether appellant had reason to fear imminent bodily harm—an element that was at the heart of his claim of self-defense.

 ■■■ " 'The rule in Maryland is that a lay witness is not qualified to express an opinion about matters which are either

within the scope of common knowledge and experience of the jury or which are peculiarly within the specialized knowledge of experts.'" *Goren v. United States Fire Insurance Co.*, 113 Md.App. 674, 685, 688 A.2d 941, 946 (1997), (quoting *King v. State,* 36 Md.App. 124, 373 A.2d 292 (1977)). Moreover, pursuant to Maryland Rule 5–701, the opinion of a non-expert must be "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *See Wyatt v. Johnson,* 103 Md.App. 250, 268, 653 A.2d 496 (1995); *Waddell v. State,* 85 Md.App. 54, 66, 582 A.2d 260 (1990); Lynn McLain, MARYLAND EVIDENCE, §§ 602.1, 701.1 (1987). The admissibility of lay opinion testimony that satisfies the criteria is vested in the sound discretion of the trial court. *Tedesco v. Tedesco,* 111 Md.App. 648, 666, 683 A.2d 1133 (1996); *Waddell,* 85 Md.App. at 66, 582 A.2d 260.

 We observe that Rule 5–704(b) specifically bars an *expert* witness from testifying with respect to a defendant's mental state when that mental state constitutes an element of the crime charged. The Court explained in *Hartless v. State,* 327 Md. 558, 573, 611 A.2d 581 (1992), that "psychiatrists have not been shown to have the ability to precisely reconstruct the emotions of a person at a specific time, and thus ordinarily are not competent to express an opinion as to the belief or intent which a person in fact harbored at a particular time." *See also Globe Security Systems v. Sterling,* 79 Md.App. 303, 307–08, 556 A.2d 731 (1989). The rule, however, is silent as to lay witnesses. We also acknowledge that an opinion generally is "not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." Rule 5–704(a). Nevertheless, we conclude that the views of the witnesses as to appellant's state of mind were erroneously admitted. We explain.

"The distinction between fact and opinion is often difficult to draw." Joseph F. Murphy, Jr., MARYLAND EVIDENCE HAND-BOOK, § 603(B), at 330 (1993). But, "when ... the witness is 'pulling together' his observations and is therefore testifying

to conclusions, the trial judge should not admit such testimony." *Id.*, § 603(A), at 328; *see also, e.g., In Re Nawrocki*, 15 Md.App. 252, 289 A.2d 846 (1972) (finding that officer's testimony that juvenile used "profane" language was conclusory; it was for the trier of fact to determine if the language was "profane"). In *Goren*, we found error in the trial court's admission of the investigating police officer's conclusions as to how the fatal automobile accident occurred. Although the officer personally observed certain conditions at the scene, he lacked the expertise to reconstruct the circumstances of the occurrence.

In our view, the witnesses' testimony did not satisfy the criteria of Rule 5–701. They clearly lacked "first-hand knowledge," *Waddell*, 85 Md.App. at 66, 582 A.2d 260, as to the central issue concerning appellant's state of mind. Further, their conclusions were not "helpful to a clear understanding of [their] testimony or the determination of a fact in issue." Maryland Rule 5–701. The jury, in its role as fact-finder, "should be, to the greatest possible extent, the sole judge of the facts, and should reach its own conclusions as to the weight of the evidence." McLain, *supra*, § 701.1, at 194. Certainly, both men were qualified to describe what they personally saw when their attention was focused on the altercation. From their factual testimony, the State would have been entitled to argue to the jury that appellant was not reasonably in fear of imminent bodily harm. Their opinions on that issue, however, were not properly received in evidence.

## III.

Appellant complains that he was denied the opportunity to produce evidence from which the jury could infer that Bryan lunged at appellant. The evidence consisted of the testimony of a grocery store security guard, Keith Henry. In 1992, Henry was trying to handcuff Bryan, a suspected shoplifter. As the two struggled, Bryan tried to get Henry's gun and the gun went off.

The trial court found this evidence irrelevant. We agree. Bryan's conduct while being arrested for an unrelated incident had little relevance to his conduct during a street fight three years later. A trial court's determination of relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion. *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991).

In any event, we note that Christopher testified that "[m]y brother would have ... rushed him" if he saw a gun. Thus, the trial court allowed other evidence from which the jury could have inferred that Bryan would have reacted to the sight of a gun by lunging at appellant.

### IV.

In July 1994, Christopher was convicted of attempted murder, assault with intent to maim, assault with intent to disable, and assault with intent to disfigure. The trial court precluded the defense from introducing evidence of these prior convictions, reasoning that the danger of prejudice outweighed any probative value of the convictions. Appellant complains that the trial court erred in its balance of those factors, because these convictions were relevant to Christopher's credibility.

When reviewing the process of balancing probative value and potential for prejudice, we give great deference to the trial court, and will not disturb that court's discretion unless it has been abused. *Jackson v. State,* 340 Md. 705, 719, 668 A.2d 8 (1995). Nevertheless, in view of our decision to reverse, we need not address this issue further. Nor do we express any opinion as to whether the particular offenses fall within the " 'eligible universe' " of admissible prior convictions. *State v. Giddens,* 335 Md. 205, 213, 642 A.2d 870 (1994). On remand, appellant is entitled to renew his request to impeach with prior convictions, pursuant to Maryland Rule 5–609 and relevant case law.

### V.

The trial court did not permit appellant to cross-examine Christopher as to three instances of prior misconduct. Under

Rule 5–608(b), the trial court *may* permit a witness to be examined about prior conduct that did not result in a conviction but is, nevertheless, probative of a character trait of untruthfulness. This determination is discretionary and, therefore, will not be reversed in the absence of abuse. See *Jackson,* 340 Md. at 719, 668 A.2d 8.

Appellant sought to cross-examine Christopher as to three acts. The first was a theft incident in which he was named as a co-defendant in a statement of charges. The trial court reviewed the charging document and refused to allow appellant to use it for impeachment, because there was no conviction and the basis for cross-examination would be an uncorroborated statement of a codefendant.

The second act that appellant proposed as impeachment involved charges of assault on a police officer and obstruction of justice in 1993. Appellant informed the trial court that he was "not talking about the assault on the Officer" but, instead, was arguing that Christopher's failure to stop and his attempt to flee were indicative of someone who is dishonest. In balancing the probative value and the danger of prejudice, the trial court considered the fact that the charge of eluding the officer was *nol prossed.*

Finally, appellant attempted to impeach the witness with regard to a confrontation with his co-defendant in a theft case. He argues that this conduct involved an obstruction of justice and, therefore, was relevant to credibility, because the altercation arose after the co-defendant implicated Christopher in the theft. In considering this point, the trial court recollected that this was the confrontation that resulted in the criminal convictions that we discussed in Part IV, above. The trial court also considered the lack of evidence that Christopher even knew that the co-defendant had implicated him, and agreed with the State that evidence of the incident was "a mini-trial on a totally extrinsic matter."

In view of our resolution of this case, we decline to address this issue further. On remand, appellant is entitled to renew his request to impeach with prior bad acts.

512

JUDGMENTS REVERSED.

CASE REMANDED TO CIRCUIT COURT FOR BALTI-
MORE COUNTY FOR NEW TRIAL.

COSTS TO BE PAID BY BALTIMORE COUNTY.