43 A.3d 1098

Kevin Mark WARREN

v.

STATE of Maryland.

No. 1996, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 2, 2012.

96

Gregory W. Gardner (Paul B. DeWolfe, Public Defender, Baltimore, MD, Kenneth E. McPherson, Riverdale, MD, on the brief), for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WRIGHT, MATRICCIANI, and WATTS, JJ.

WATTS, J.

Following a trial held from March 3, 2009, to March 13, 2009, a jury in the Circuit Court for Charles County convicted Kevin Mark Warren, appellant, of one count of first-degree murder (felony murder), two counts of attempted first-degree murder, three counts of first-degree assault, three counts of attempted robbery with a dangerous weapon, three counts of use of a handgun in the commission of a crime, and one count of wearing, carrying, or transporting a handgun.[1] *See* Md. Code Ann., Crim. Law Art. ("C.L.") § 2–201 (first-degree murder); C.L. § 2–205 (attempted first-degree murder); C.L. § 3–202 (first-degree assault); C.L. § 3–403 (attempted rob-

---

**1.** This was appellant's second trial. Appellant's first trial was held from May 12, 2008, to May 22, 2008, and resulted in convictions on all counts. On September 4, 2008, the circuit court granted appellant's motion for a new trial.

bery with a dangerous weapon); C.L. § 4–204 (use of a handgun in the commission of a crime); C.L. § 4–203(wearing, carrying, or transporting a handgun). On September 28, 2009, the circuit court sentenced appellant to life imprisonment for first-degree murder, two life sentences consecutive for attempted first-degree murder, and twenty years' imprisonment concurrent for use of a handgun in a crime of violence.[2] Appellant noted an appeal raising three issues, which we rephrased and reordered into four:[3]

I.  Whether the circuit court erred in finding that appellant voluntarily, knowingly, and intelligently waived his *Miranda*[4] rights before speaking to law enforcement officers?

II.  Whether the circuit court erred in allowing the prosecutor to cross-examine appellant about prior statements to other people, which appellant characterizes as "inadmissible testimonial hearsay"?

III.  Whether the circuit court deprived appellant of the right to a fair trial by: (A) permitting incorrect testimony which was later corrected by a stipulation; and (B) allowing the prosecutor to cross-examine appellant regarding the invocation of the right to remain silent?

IV.  Whether the circuit court erred in allowing the prosecutor to make alleged improper remarks during closing and rebuttal argument?

---

**2.**  The remaining convictions merged for sentencing.

**3.**  Appellant phrased the issues as follows:
I.   Should the conviction below be reversed because the trial court allowed inadmissible testimonial hearsay evidence to impeach the Appellant?
II.  Should the conviction below be reversed because the trial court admitted the Appellant's statements to law enforcement without a valid waiver of the Appellant's *Miranda* rights?
III. Should the conviction below be reversed because the State used numerous improper statements and arguments?

**4.**  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

We answer all four questions in the negative and, therefore, affirm the judgments of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2007, appellant was indicted in connection with a robbery and shooting that occurred at Robinson Place in Waldorf, Maryland, that resulted in the death of Briona Porter, a thirteen-year-old girl.

### Reading of Appellant's *Miranda* Rights

Prior to trial, appellant moved to suppress statements he made to Detective John Elliott at the Charles County Police Headquarters Building on July 6, 2007. On April 18, 2008, the circuit court conducted a hearing on the motion. As a witness for the State, Detective Elliott testified as follows:

> Before I asked [appellant] any questions I read him his Miranda Rights and a right for his Prompt Presentation before a District Court Commissioner.
>
> *     *     *
>
> I read word for word from my Rights card and I stated to [appellant], "You have the right to remain silent. Anything you say, can and will be used against you in court. You have the right to consult with a lawyer before answering any questions and to have a lawyer with you during any questioning. If you cannot afford a lawyer, one will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time."

The State questioned Detective Elliott, in pertinent part, as follows:

> [PROSECUTOR:] Okay. Now, after you advised him of these rights, what, if anything did you ask him?
>
> [DETECTIVE ELLIOTT:] I asked him if he understood his right [sic] and he said, "yes."
>
> *     *     *

[PROSECUTOR:] Okay. Let me ask you this. Are you familiar with individuals under the influence of alcohol?

[DETECTIVE ELLIOTT:] Yes sir.

[PROSECUTOR:] All right. Did you have, did [appellant] appear to be under the influence of any alcohol?

[DETECTIVE ELLIOTT:] No sir, he did not.

[PROSECUTOR:] Or any drugs?

[DETECTIVE ELLIOTT:] No sir.

\* \* \*

[PROSECUTOR:] Did he appear to understand you?

[DETECTIVE ELLIOTT:] Yes sir.

\* \* \*

[PROSECUTOR:] Okay. Can you continue with what happened after you advised [appellant] of his Miranda Rights and Right to Prompt Presentment?

[DETECTIVE ELLIOTT:] I asked [appellant] where he had been up to the week leading to where he was arrested. [Appellant] explained to me that he had seen his picture on the news Monday or Tuesday, the previous Monday or Tuesday, and that he was wanted for murder, and that he was visiting family.

[PROSECUTOR:] Okay. And what else?

[DETECTIVE ELLIOTT:] I questioned [appellant] specifically about the murder and the incident which occurred on Robinson Place. [Appellant] said that he was there on the scene when it occurred. First he said he was by himself, but then he said, no, he was with a person who he identified as Man and Deonte [sic]. And he explained to me that he was on Robinson Place in the area of what they call "the cut". And while in "the cut" he observed an ice cream truck drive into Robinson Place, he heard a gunshot, everybody ran and he went to, who he identified as, Little Ray's house.

[PROSECUTOR:] Okay. What else occurred during this interview?

[DETECTIVE ELLIOTT:] I specifically asked [appellant] if he was responsible for this. He denied doing the shooting. And he was unable to provide or identify anyone that was responsible for the shooting.

[PROSECUTOR:] Okay. Anything else that you can recall?

[DETECTIVE ELLIOTT:] At one point during the interview I asked [appellant] to show me the palms of his hands. I asked him what he saw. [Appellant] told me, "fingerprints." I explained to him, while showing him a picture of a metal cashbox, which was just inside the ice cream truck, the night the incident occurred. I asked him, "Do you realize the significance of your fingerprints on this cash metal box?" He replied to me that it didn't look like a metal box to him. As soon as the questioning stopped he didn't provide an explanation and I didn't question him any further about that issue.

[PROSECUTOR:] Okay. Did there come a time when he indicated that he didn't want to answer any more questions?

[DETECTIVE ELLIOTT:] Yes sir.

\* \* \*

[PROSECUTOR:] What, if any offers of reward did you make to [appellant?]

[DETECTIVE ELLIOTT:] I did not make any.

[PROSECUTOR:] What, if any threats did you make to him?

[DETECTIVE ELLIOT:] I did not make any threats.

[PROSECUTOR:] What, if any inducements did you make to him in order to get him to talk to you?

[DETECTIVE ELLIOT:] None at all.

Detective Elliott testified that "[a]t about quarter to [one] in the morning [appellant] told me he didn't want to answer any more questions without a lawyer and I stopped questioning him." The circuit court ruled orally from the bench, granting the motion, in part, and denying it, in part, as follows:

[I] do find Det. Elliott's testimony to be credible. That he did in fact read [appellant] his Miranda Rights. He read

from the card. He read both sides of the card; the Miranda Rights and also the Prompt Presentment Rights. That Det. Elliott stated that he asked the defendant if he understood his rights and he responded, "yes." Det. Elliott also described how [appellant] did not appear to under [sic] the influence of drugs or alcohol, he appeared to understand his questions when being asked and [appellant] proceeded to give some statements. I find that those statements were voluntary and that the State has met its burden on that.

I do find, however that when [appellant] stated, 'I don't want to talk any more,' or something to the effect, 'I'm done talking,' at that point that was his invocation of his right to remain silent and any statements made thereafter, I believe would have required probably a re-Mirandaization or some safeguard. But at this point I find that that was a full invocation of his right to remain silent and anything elicited after this is suppressed.

### Trial

At trial, as a witness for the State, Charlene Woodland testified that she owned and operated an ice cream truck as a business to help raise money to send her daughter to college. Woodland testified that, as of June 29, 2007, she had not yet operated the truck for ice cream sales during 2007. According to Woodland, that night, after getting the truck's generator fixed, she took the ice cream truck for a "test drive" and ended up at Robinson Place. Woodland's thirteen-year-old daughter, Briona, and Woodland's friend, Tanya Butler, accompanied her in the rear of the truck. Woodland testified that she stopped her ice cream truck at the end of Robinson Place to adjust her side mirrors. According to Woodland, she went in the back of the truck and saw a man, whom she identified at trial as appellant, with a gun in the window. Woodland testified that Butler said they were being robbed and told her to get the money box. Woodland retrieved the money box, shoved it at appellant, ran back to the driver's seat, and started driving away. Woodland testified that she heard gunshots, and that Briona screamed "mommy, he hit

me." Woodland continued driving until she saw a law enforcement officer, who came to her assistance. Briona was taken from the scene by medical personnel and Woodland testified that this was the last time she saw Briona alive.

During appellant's cross-examination of Woodland, the following colloquy occurred:

[APPELLANT'S COUNSEL]: Well, Ms. Woodland, isn't it true that you never told anyone that you could recognize the man who shot your daughter?

[WOODLAND]: It's not true. I told the State.

[APPELLANT'S COUNSEL]: You're saying you told one of the State's Attorneys?

[WOODLAND]: Yes, I did.

[APPELLANT'S COUNSEL]: You actually . . . you didn't tell the State's Attorney until after the first trial had already started?

[WOODLAND]: No. Before.

[APPELLANT'S COUNSEL]: Can we approach, Your Honor?

During a bench conference, the prosecutor stated that appellant's counsel "has confused [Woodland] as to the date." The circuit court stated that: "We all know that she is confused. She is confused with dates." The cross-examination resumed, and the following occurred:

[APPELLANT'S COUNSEL]: Ms. Woodland, you're telling us that you told [the prosecutor] that you could recognize the person who shot your daughter, is that correct?

[WOODLAND]: I told him yes I could tell him who it was. The same person who I saw June 29th.

\* \* \*

[APPELLANT'S COUNSEL]: So, the time you first said that you thought you could recognize the person who shot your daughter was some time when you were in this courthouse, but you were not inside this courtroom?

[WOODLAND]: That was not the first time. The first time I could identify him was the night he had the gun in my

face. That's when I could identify him. I will never forget that face.

Later in the trial, after Woodland's testimony, the circuit court read the following stipulation to the jury:

The State and the Defense have agreed that on May 13th, 2008, the day after the jury trial started in the first trial of this matter, Charlene Woodland, while located in the State's Attorney in this courthouse [sic] for the first time said that she would be able to identify the individual responsible for the alleged robbery and shooting involving her ice cream truck on June 29th, 2007. These facts are not in dispute and should be considered proven.

Tanya Butler testified, as a witness for the State, that on the night of June 29, 2007, she accompanied Woodland and Briona in the truck to obtain gas for the generator. She and Briona were riding in the back of the ice cream truck that Woodland was driving. According to Butler, the gas station was closed and Woodland said she would show them a place "where there's a lot of kids where [she goes] to all the time." Woodland pulled into a "community" and stopped to fix the mirrors on the truck. After the truck was parked, a man, whom Butler identified at trial as appellant, came up to the truck, bought a bag of potato chips, walked away and came right back, pulled out a gun, and demanded money. According to Butler, as she responded to the man, Woodland approached the rear of the truck. Butler told Woodland the man was robbing them. Butler corroborated Woodland's testimony that she gave the man the money box, and the man shot at the truck as they drove away. Butler testified that Briona was shot in the back. Like Woodland, Butler testified that Briona said "mommy, he shot me, mommy." Butler testified that Briona was "like [her] niece."

As a witness for the State, Roy James Irby testified that while he and appellant were in the same unit at the county jail, appellant discussed the case with him. According to Irby, appellant told him that he had been out "partying, drinking and drugging" with Deante Duckett, and he (appellant) shot at

an ice cream truck. Irby testified that appellant told him that "I guess you heard, I've got a body. And, I [Irby] said a body? You mean a child ... a thirteen year old child. I said, why did you do it? And, he goes, because I can." Irby testified that appellant stated "and the ice cream truck came along. It pulled up. And, now he [appellant] was harassing them ... was harassing the people in the truck ... the women in the ice cream truck. And, apparently she didn't like what was going on. And, he said she said something and took off. Well, he the[n] demonstrated pulling out a gun and going, boom, boom, boom. And, the of course running."

As a witness for the State, Deante Duckett testified that, on June 29, 2007, he was near Robinson Place drinking alcohol with appellant, who was wearing a black and red Chicago Bulls baseball cap. According to Duckett, appellant went to an ice cream truck, bought a bag of potato chips, and went back to the truck. Duckett testified that he saw appellant sticking a gun into the truck and asking for money. Duckett testified he saw the truck accelerate and then heard gunshots.

Kevin Wise, appellant's father, testified as a witness for the State, that on July 1, 2007, he saw his son in Washington D.C. Appellant advised Wise that he was being accused of killing a child and was going to go to Charles County to turn himself in.

In his own defense, appellant testified that on June 29, 2007, he went to Robinson place to sell drugs. Appellant testified that he had been wearing a black and red Chicago Bulls hat. According to appellant, five other people, including Duckett, were present and were drinking with him. Appellant testified that he saw a truck coming up Robinson Place and thought that it was law enforcement. Appellant testified that he went to Oakley Drive and then heard gunshots coming from Robinson Place.

### State's Cross–Examination of Appellant

During the State's cross-examination of appellant, the following colloquies occurred:

[PROSECUTOR]: You don't remember having a conversation with Man, William Smothers, over in the jail about this incident?

[APPELLANT]: No, sir.

[PROSECUTOR]: Remember telling him how you stuck the gun up in there and started shooting in the ice cream truck?

[APPELLANT'S COUNSEL]: I object.

THE COURT: Overruled.

[PROSECUTOR]: Don't remember that?

[APPELLANT]: I never told him nothing like that, sir.

\*     \*     \*

[PROSECUTOR]: Okay. That's what you say today, but that's not what you told Detective Elliott, is it?

[APPELLANT]: That's what I told him back then when he . . . when he questioned me.

[PROSECUTOR]: That you were on Oakley when the shots were fired?

[APPELLANT]: Correct.

[PROSECUTOR]: You didn't tell him you were on Robinson Place?

[APPELLANT]: No, sir.

[PROSECUTOR]: Now, you told Detective Elliott you didn't know you were wanted until Monday or Tuesday, which would have been . . . let's see, the 29th was a Friday, right?

[APPELLANT]: Correct.

[PROSECUTOR]: Okay. And, the 30th was Saturday. And, July 1st, that's when you went down to your father's house, right?

[APPELLANT]: Correct.

[PROSECUTOR]: Said you didn't know you were wanted until Monday or Tuesday, right?

[APPELLANT]: No, I told him Sunday morning.

[PROSECUTOR]: Told him you knew you were wanted Sunday morning?

[APPELLANT]: Correct.

[PROSECUTOR]: Okay. But, now that's not what your father said earlier, was it?

[APPELLANT]: I don't know what he said.

[PROSECUTOR]: Well, you were sitting right there when he testified.

[APPELLANT]: Yes.

[PROSECUTOR]: Alright. Now, you said you were there by yourself to Detective Elliott first, right? And, then you quickly changed up and said, no, I wasn't out there by myself?

[APPELLANT]: No, sir.

[PROSECUTOR]: You didn't say that?

[APPELLANT]: N. [sic]

\*    \*    \*

[PROSECUTOR]: And, you said I ... it don't even look like a metal box to me, right? Right?

[APPELLANT]: I said something like that.

[PROSECUTOR]: Okay. And, it's at that point when he presses you on the fingerprints and you say I don't want to answer any more questions, right?

[APPELLANT]: Correct.

[PROSECUTOR]: So, you didn't say I don't want to answer any more questions or I don't want a lawyer or any of that stuff until he puts this picture in front of your face and tells you the significance of the fingerprints, right?

[APPELLANT]: Correct.

\*    \*    \*

[PROSECUTOR]: You don't know Jonathan Marshall over in the jail?

[APPELLANT]: No, sir.

[PROSECUTOR]: Okay. Don't even ... never talked to him over there?

[APPELLANT]: No, sir. Never heard of him.

[PROSECUTOR]: Never heard of him? You never told . . . you never said anything to him about I had to try my hand; you know me; you know how I get it, right? Talking about this murder, right?

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: You didn't say that?

[APPELLANT]: No, sir.

[PROSECUTOR]: Okay. Didn't say I had to put that joint up in there? Didn't say that, right?

[APPELLANT]: No, sir.

[PROSECUTOR]: You weren't doing any bragging over there in the jail about shooting this girl, were you?

[APPELLANT]: No, sir.

[PROSECUTOR]: No. Okay. Not at all, right?

[APPELLANT]: Correct.

[PROSECUTOR]: And, you didn't try to get Frank Leopard to lie on Deante Duckett for you, did you?

[APPELLANT]: No, sir.

＊　　　＊　　　＊

[PROSECUTOR]: I mean, you know who Frank Leopard is now, right?

[APPELLANT]: Yes.

[PROSECUTOR]: Okay. Do you remember Frank Leopard . . . you . . . you told him that the person . . . you wanted him to come to your trial and testify that the person that tried to rob him was Deante Duckett and he had a silver nickel plated gun, right?

[APPELLANT]: Incorrect.

[PROSECUTOR]: Okay. You never told Frank Leopard that?

[APPELLANT]: No, sir.

[PROSECUTOR]: Okay. Now, and I suppose you never told Daryl Duckett when you talked to him that you messed . . . messed up by doing this, did you?

[APPELLANT]: I never talked to Daryl Duckett.

[PROSECUTOR]: Never talked to Daryl Duckett either. Alright.

[APPELLANT'S COUNSEL]: Object to commentary.

THE COURT: Okay. Sustained.

\* \* \*

[PROSECUTOR]: [Appellant], Deante Duckett didn't shoot this girl, did he?

[APPELLANT]: I don't know.

[PROSECUTOR]: Certainly can't say that he did, can you?

[APPELLANT]: No.

\* \* \*

[PROSECUTOR]: Okay. Because, I mean, if he had told you in your house the next day, man, I shot this girl. What do I do? You certainly would sit up here and tell us, wouldn't you?

[APPELLANT]: Correct.

[PROSECUTOR]: Right? Matter of fact, this is the first time you've ever said anything publically to anybody about this meeting you had with Deante Duckett the next day, right?

[APPELLANT'S COUNSEL]: I object.

[PROSECUTOR]: Okay.

[APPELLANT'S COUNSEL]: He has a constitutional right to remain silent until his attorney. . . .

[PROSECUTOR]: I'll rephrase, Your Honor. Didn't you tell Detective Elliott about this Deante Duckett discussion, did you?

[APPELLANT]: Yes, I told him.

[PROSECUTOR]: You told him . . . okay. Okay. So, you told Detective Elliott that Deante Duckett came to your house the next day?

[APPELLANT]: Yes.

[PROSECUTOR]: And, told you that they're saying that we did something?

[APPELLANT]: Correct.

[PROSECUTOR]: That we shot this girl in this ice cream truck?

[APPELLANT]: Correct.

[PROSECUTOR]: So, you told Detective Elliott that and everything else you said here today?

[APPELLANT]: Correct.

\* \* \*

[PROSECUTOR]: Now, did you tell Detective Elliott about Deante as far as how he appeared that night?

[APPELLANT]: No.

## Jury Instructions

Before closing arguments, the circuit court instructed the jury, in pertinent part, as follows:

The defendant is presumed to be innocent of the charges. This presumption remains with the defendant throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The defendant is not required to prove his innocence.

\* \* \*

The following things are not evidence and you should not give them any weight or consideration: ... questions and objections of counsel.... You must disregard questions that I did not permit the witness to answer and you must not speculate as to the possible answers.

\* \* \*

Opening statements and closing arguments of the lawyers are not evidence in this case. They are intended only to help you to understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers or I may say, you must rely on your own memory of the evidence.

### Closing Arguments

During the State's closing argument, the prosecutor stated:

You also heard from Charlene Woodland. And, what does she say, ladies and gentlemen, when she comes back she sees [appellant] pointing a gun in her face. And, she told you that she will never forget that face of the man who is pointing a gun at her. And, ladies and gentlemen, that makes sense. She is not going to forget the face of the man who killed her only child. She saw him under the same lights that Tanya Butler saw him. You can judge their credibility, but they were not mistaken, ladies and gentlemen.

Appellant did not object during the State's closing argument.

During appellant's closing argument, appellant's counsel argued that the State had not proven the occurrence of a robbery beyond a reasonable doubt. Appellant's counsel stated:

Ladies and gentlemen, I don't think you should be convinced that a robbery occurred as they said it occurred. Now remember, the Judge instructed you that the defense is presumed innocent and we don't have to prove anything. You don't have to find beyond a reasonable doubt that Deante Duckett did it ... to find [appellant] not guilty. And, you don't have to find beyond a reasonable doubt that these two women's [Woodland's and Butler's] stories are not the truth, the whole truth and nothing but the truth in order to find [appellant] not guilty.

\*　　\*　　\*

Now, that doesn't mean they weren't robbed. I just said to you that I don't ... I can't believe beyond a reasonable

doubt that they [Woodland and Butler] were robbed, but rather none of us should because they're not telling the truth, the whole truth. They . . . they go over there and they say that they stopped to fix the mirrors. Why aren't Charlene Woodland's fingerprints on the mirrors?

\*     \*     \*

And, if you had expert testimony that would help you know the likelihood . . . the probabilities then you could put some value to that evidence. They don't mind coming in here and telling you it's one in 6.6 million chances that it is [appellant]'s DNA on that bottle. But, they can't tell you the probability of someone shooting a gun at a moving target and hitting the very same hole.

During the State's rebuttal closing argument, the prosecutor argued:

I sit there and listen to [appellant's counsel]'s arguments and the first thing that comes up to me is unbelievable that he can actually stand there and say the things that he did like this is no robbery; can't believe it.

A lot of sound and fury. I'm sure you've heard that phrase before. Well, that's actually a quote. It's from Shakespeare, from Macbeth, and the full quote is: It is a tale . . . and I'm quoting now . . . it is a tale told by an idiot full of sound and fury signifying nothing. That's what the entire argument told by [appellant's counsel] was. Didn't mean a thing. Means nada. Nothing. Not a dag on thing.

He stood up here in front of you on several occasions and said that if the forensic evidence . . . if this fingerprint doesn't show this, this fingerprint doesn't show that you have to find [appellant] not guilty.

\*     \*     \*

It is a red herring, ladies and gentlemen. And, quite frankly, that's what [appellant's counsel's] argument was all full of . . . red herrings.

\*     \*     \*

[I]s there anybody in this case who is more desperate to get this right than Tanya Butler and Charlene Woodland? Please tell me you understand the mother of the thirteen year old child ... their only child ... wants to see it done right. Do you think they're going to be led around by the nose and put it on anybody that the police want to select as [appellant's counsel] wants you to believe? Do you think they're going to engage in essentially a conspiracy? Because that's what he is talking about. Okay? That's what he has come up with. Not only conspiracy with the witnesses, but with me the State, all the police. Do you think they're going to willingly, voluntarily walk in here and say that guy did it if he didn't? Motive to tell the truth. Because if that ain't the right guy then they're letting poor Briona lay there without any justice and they're a party to it. That's motive to tell the truth, ladies and gentlemen. That's a lot of motive.

※  ※  ※

And, speaking of hats, where is [appellant]'s hat? He doesn't have any burden whatsoever putting the evidence on whatsoever. But, he got up there and said, hey, I had a black hat on with red, this that and the other. Same scrutiny as every other witness. He wants to be believed. Where is the hat? We don't have it. Wasn't out there on the scene. He was on the run for five, six, seven days, whatever it is. Shoot, he could have had him [sic] momma buy a hat like he described and bring in here. We wouldn't have known the difference. No hat. Could have had a black hat on just like they said ... like Deante [Duckett] said.

※  ※  ※

[H]ow in the world does Roy Irby [who, as a witness for the State, testified that appellant told Irby in jail that appellant robbed the ice cream truck] know that the gun shots ... the bullets went into the back of this truck? Remember he testified to that? I hope you caught it. I said, where did [appellant] tell you he was standing in location to the truck

when he shot it?  He said, he was in the back in the rear.
How does he know that?  That's not in any police report
anywhere.  Excuse me.  I misspoke.  Certainly in a police
report.  It's not in any press anywhere.  How is anybody
going to know . . . how is anybody going to know that?

And, let me say something else to you because it was kind
of interesting.  When we were selecting the jury here
somebody talked about, you know, when you talk about a
child being killed around an ice cream truck I think the
immediate vision everybody gets is, you know, five or six
kids are hanging around the . . . the ice cream truck buying
ice cream.  Right?  And, somebody starts popping off
rounds.  You know, it could happen any way, right?

My point is is [sic] that Roy Irby has the factual scenario
correct.  And, that struck me, actually, during the selection
of this jury because one of the people who is not in the jury
said, well, you know, with a whole bunch of kids around the
. . . around the ice cream truck, you know, why in the heck
would somebody start firing?  And, it just struck me that,
you know, yeah, this could happen any way.

But, it doesn't just happen any way.  It happens the way
Roy Irby said it happened.  It happened the way that
Deante Duckett said it happened.  But, how does Roy get it
right unless [appellant] told him?  Unless he told him, and
he did tell him.

\*       \*       \*

[Appellant's counsel is] up here railing against the DNA . . .
railing against the DNA, and puts his client up on the stand
and says, hey, yeah, I was drinking out of a bottle.  It's all a
red herring.  It signifies nothing.  It's a whole bunch of
sound and fury on the DNA and Deante Duckett.

\*       \*       \*

You've got an eyewitness to the crime [Deante Duckett] who
could not have committed the crime.  You have two other
witnesses [Woodland and Butler] who say, yeah, that's the
guy . . . under oath; here in court, two people . . . two

people who you cannot disbelieve because more than anybody ... more than you they want to get it right.

*     *     *

Don't let [appellant's counsel] obfuscate, confuse, and bring up all these red herrings to distract you from the real truth here ... the truth that this evidence has borne out ... that's [appellant] killed Briona Porter; tried to kill them. Three eyewitnesses right there at that window at that time. All that other noise, all that sound and fury means nothing.

Appellant did not lodge any objections to the above comments made during the State's rebuttal closing argument.

## DISCUSSION

### I.

Appellant argues that the circuit court erred in admitting statements he made to law enforcement officers concerning his actions on the night of June 29, 2007. Specifically, appellant contends that the circuit court erred in holding that the State met its burden in proving that he waived his *Miranda* rights during a custodial interrogation.

In contrast, the State maintains that appellant "voluntarily, knowingly, and intelligently waived his *Miranda* rights." The State contends that the prosecution need only show that "the suspect understood his *Miranda* rights, engaged in a course of conduct inconsistent with the assertion of those known rights, and was not subjected to any police coercion that overcame his will."

In *Moore v. State*, 422 Md. 516, 528, 30 A.3d 945 (2011), the Court of Appeals discussed the standard of review for *Miranda* issues:

[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State. We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous. We, howev-

er, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case.

In *Winder v. State*, 362 Md. 275, 765 A.2d 97 (2001), this Court stated:

> The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact. As such, we undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness. Our review of the Circuit Court's denial of Appellant's motion to suppress is limited to the record of the suppression hearing.

(Most citations and internal quotation marks omitted).

In *McIntyre v. State*, 309 Md. 607, 614–15, 526 A.2d 30 (1987), the Court of Appeals explained that the State's burden of proof for proving that a defendant waived his or her *Miranda* rights is by a preponderance of the evidence:

> In undertaking to prove a waiver of *Miranda* rights, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. The heavy burden shouldered by the State is only proof by a preponderance of the evidence. The question whether an accused waived *Miranda* rights is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.

(Citations and internal quotation marks omitted).

In *Donaldson v. State*, 200 Md.App. 581, 592, 28 A.3d 129 (2011), *cert. denied*, 424 Md. 629, 37 A.3d 318, 2012 Md. LEXIS 89 (2012), this Court explained that courts should consider the totality of the circumstances for *Miranda* issues:

> It is well established that *Miranda* stands for the requirement that, before police may interrogate a person in custody, the police must advise the person that any statement he or she makes can be used against him in a court of law, so as to protect him from compelled self-incrimination.

The person in custody may waive his *Miranda* rights if the waiver is voluntarily, knowingly, and intelligently made, and the determination of whether the waiver of an accused has been made knowingly and voluntarily is by a review of the totality of the circumstances.

(Citations and internal quotation marks omitted).

## *Miranda* Waivers

In *Logan v. State,* 164 Md.App. 1, 41, 882 A.2d 330 (2005), aff'd, 394 Md. 378, 906 A.2d 374 (2006), this Court discussed what constitutes a waiver of the *Miranda* rights:

Although an express written or oral statement of waiver of the right to remain silent . . . is usually strong proof of the validity of that waiver, [it] is not inevitably . . . sufficient to establish waiver. . . . [I]t would be absurd to think that mere recitation of the litany [of *Miranda* rights] suffices to satisfy *Miranda* in every conceivable circumstance. And, in contrast to traditional voluntariness, there is an absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of any of the applicable [*Miranda* ] rights[.]

(Citations and internal quotation marks omitted) (most omissions and alterations in original).

In *Ashford v. State,* 147 Md.App. 1, 55–56, 807 A.2d 732, *cert. denied,* 372 Md. 430, 813 A.2d 257 (2002), we held that the defendant's *Miranda* waiver was voluntary because, in part, the defendant did not testify at the motion hearing. This Court stated:

"When the issue is voluntariness, rather than *Miranda* compliance . . . the failure of a defendant to testify almost forecloses any chance of prevailing. . . . The voluntariness of a defendant's response to possible pressures . . . is very subjective. Only the defendant can truly tell us what was going on in the defendant's mind. Without such testimony, there is usually no direct evidence of involuntariness. . . . [Here, the defendant] asks us to guess what was in his head.

He actually asks us to second-guess [the circuit court] for not having guessed."

*Id.* at 56, 807 A.2d 732.

In *Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010), the Supreme Court stated: "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." In *Berghuis,* the Supreme Court held that the defendant knowingly and voluntarily waived his *Miranda* rights even though the defendant declined to sign a waiver and there was "conflicting evidence" of whether the defendant "verbally confirmed that he understood the rights listed on the form." *Id.* at 2256. The defendant was "[l]argely silent" during the interrogation before he responded "yes" to the question: "Do you pray to God to forgive you for shooting that boy down?" *Id.* at 2256–57. The Supreme Court noted that: (1) "there [was] no contention that [the defendant] did not understand his rights; and from this it follows that he knew what he gave up when he spoke"; (2) the defendant's "answer to [the detective]'s question . . . is a 'course of conduct indicating waiver' of the right to remain silent"; and (3) "there [was] no evidence that [the defendant]'s statement was coerced." *Id.* at 2262–63 (citations omitted); *see also North Carolina v. Butler,* 441 U.S. 369, 370–71, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (The Supreme Court held that the defendant waived his *Miranda* rights when law enforcement officers informed the defendant of his *Miranda* rights and the defendant replied: "I will talk to you but I am not signing any form.").

■ Returning to the instant case, we conclude based on the totality of the circumstances that appellant knowingly, voluntarily, and intelligently waived his *Miranda* rights—as appellant was an adult, there was no evidence that he was under the influence of alcohol or drugs, and he indicated he understood the rights and made an uncoerced statement to the detectives. After Detective Elliott read appellant his *Miranda* rights and asked appellant if he understood his

rights, appellant replied "yes." Appellant then made uncoerced statements in which he admitted that "he was there on the scene" of the shooting; appellant later asserted his right to an attorney. As in *Berghuis*, 130 S.Ct. at 2262–63, here, (1) "there is no contention that [appellant] did not understand his rights; and from this it follows that he knew what he gave up when he spoke" about being at the crime scene; (2) appellant's answer to Detective Elliott's questions constitutes "conduct indicating waiver of the right to remain silent"; and (3) Detective Elliott, the law enforcement officer responsible for the interrogation, testified that appellant was not coerced. According to Detective Elliott's testimony, which the circuit court found credible, appellant did not assert the right to an attorney until after answering questions, at which point Detective Elliott immediately ended the interview. Like the defendant in *Ashford*, 147 Md.App. at 56, 807 A.2d 732, appellant did not testify at the motion hearing, thus "ask[ing] us to guess what was in his head."

Given the testimony as to Detective Elliott's verbatim *Miranda* reading and appellant's response of "yes," at the motion hearing, the State demonstrated that a *Miranda* warning was given and that it was understood by appellant. As in *Berghuis*, 130 S.Ct. at 2262, appellant's "uncoerced statement establishe[d] an implied waiver of the right to remain silent." For the reasons discussed above, we conclude that the circuit court properly found that appellant knowingly, voluntarily, and intelligently waived his *Miranda* rights.[5]

## II.

■ Appellant contends that the circuit court erred in allowing the State to cross-examine him about statements he

---

5. The circuit court properly granted, in part, appellant's motion to suppress as to any statements made after appellant indicated "that he didn't want to answer any more questions." As the Court of Appeals recently discussed in *Phillips v. State*, 425 Md. 210, 223-24, 40 A.3d 25 (2012), when a defendant waives his *Miranda* rights, and then subsequently invokes his right to counsel or to remain silent, no further impermissible continuing interrogation may occur.

allegedly made before trial, admitting to the crimes that took place on June 29; 2007. Appellant argues that "the State used inadmissible hearsay declarations from unavailable witnesses in an attempt to impeach" him.[6] Appellant maintains that the line of questioning by the State contained two levels of hearsay—the first level being appellant's alleged confession to out-of-court declarants and the second level being the communication by the out-of-court declarants to State investigators to convey the alleged confession. Appellant argues that this error violated his right to cross-examine the witnesses against him.

In contrast, the State maintains that the circuit court properly permitted the prosecutor to ask appellant whether he had confessed committing the crime to others. The State argues that "[a]sking a witness, and particularly the accused, to deny his or her own prior statement is a quintessential form of proper impeachment." The State contends that there was no error as the prosecution impeached appellant with his own prior statements, rather than the statements of another.

We review hearsay rulings *de novo*. *Parker v. State*, 408 Md. 428, 437, 970 A.2d 320 (2009). Maryland Rule 5–801(c) provides: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5–802 provides: "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Maryland Rule 5–803(a)(1) provides: "The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: Statement by party-opponent. A statement that is offered against a party and is: The party's own statement, in either an individual or representative capacity[.]"

---

6. In his brief before this Court, appellant failed to identify any alleged "inadmissible hearsay declarations." In its brief, the State discussed what it believed appellant contended to be the "inadmissible hearsay declarations." It was not until appellant filed a Reply Brief in this Court, that he confirmed that the State correctly identified the allegedly objectionable line of questioning.

Witnesses may be questioned with their prior statements in two very distinct circumstances. Maryland Rule 5–802.1, entitled "Hearsay exceptions—Prior statements by witnesses," provides for admission of prior statements for their truth, as substantive evidence, as an exception to hearsay. The Rule provides, in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic means contemporaneously with the making of the statement[.]

The Committee Note to Maryland Rule 5–802.1 provides: **"This Rule does not affect the admissibility of prior inconsistent statements for impeachment purposes."** (Emphasis added).

Maryland Rules 5–613 and 5–616 provide for the use of prior statements of witnesses for impeachment purposes. Maryland Rule 5–613, entitled "Prior statements of witnesses," provides:

(a) Examining witness concerning prior statement. A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) Extrinsic evidence of prior inconsistent statement of witness. Unless the interests of justice require, extrinsic

evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

Maryland Rule 5–616, entitled "Impeachment and rehabilitation—Generally," provides, in pertinent part, as follows:

(a) Impeachment by inquiry of the witness. The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:

(1) Proving under Rule 5–613 that the witness has made statements that are inconsistent with the witness's present testimony[.]

. . .

(b) Extrinsic impeaching evidence.

(1) Extrinsic evidence of prior inconsistent statements **may** be admitted as provided in Rule 5–613(b).

(Emphasis added).

This Court has previously held that the State, in seeking to elicit a prior inconsistent statement from a witness, may, but is not required, to call the third party to whom the statement allegedly was made. In *Snyder v. State*, 104 Md.App. 533, 559, 657 A.2d 342, cert. denied, 340 Md. 216, 665 A.2d 1058 (1995), the State questioned a witness by asking: "Do you remember having a conversation with Bernie Smith in September of 1989 in Tuggy's Bar?" The witness denied having such a conversation, and the State followed up: "Mr. Smallwood, isn't it true that you told Bernie Smith in Tuggy's September of 1989 that when you picked up [appellant] that morning [appellant] was washing clothes and appeared to be nervous; didn't you tell Bernie Smith that?" *Id.* (alterations in original). The witness denied having that conversation and instead stated that Bernie Smith made up the entire conversation. *Id.* Upon review, this Court held as follows:

In the present case, the witness was informed of the time and place that the statement was made, the individual to whom it was made, and the substance of the statement.

The State laid the proper foundation to impeach the witness with the prior inconsistent statement and we perceive no error. Contrary to appellant's contention, it was not incumbent upon the State to have Bernie Smith testify at trial regarding the alleged statements that Adolph Smallwood [the witness] made. There is no requirement that the State must introduce extrinsic evidence of the prior inconsistent statement after the witness denies having made the statement. Joseph F. Murphy, Jr., Maryland Evidence Handbook, § 1302(F)(2) at 677 (1989).

*Snyder,* 104 Md.App. at 560, 657 A.2d 342.

In *Bell v. State,* 114 Md.App. 480, 488–89, 691 A.2d 233 (1997), this Court reversed and remanded when the prosecutor cross-examined the defendant with a series of "would it surprise you"[7] questions, comprised of another person's prior statements. In *Bell,* the prosecutor, in the midst of asking a series of "would it surprise you questions" asked: "How about this one that when you get back to the house, Cory Tart's house, after you have shot Chris and Bryan Maxwell you say 'Those b[ ] aren't going to be calling us b[ ] anymore'?" *Id.* at 489, 691 A.2d 233. Finding error in the State's use of the "would it surprise you" questions,[8] this Court stated:

Additionally, prior inconsistent statements of the witness may be examined with a view towards challenging the

---

7.  For example, in *Bell,* the following "would it surprise questions" were asked of the defendant: (1) "Would it surprise you that Joey Buckler said that you yelled out ... to that car, 'F[ ] you p[ ]?' "; (2) "Would it surprise you that Joey Buckler said in his written statement 'They are coming. The car is coming?' "; (3) "Would it surprise you that no where [sic] does Joey Buckler say anything about a robbery—... In his written statement. Does it surprise you that Joey Buckler never says anything about a robbery in his written statement?"; and (4) "[W]ould it surprise you in his written statement Joey Buckler says you said, 'We all are the only ones who know about it. And if this gets out, you guys will get it?' " 114 Md.App. at 488–89, 691 A.2d 233.

8.  In rendering our holding, this Court found objectionable the questions: (1) "Would it surprise you that Joey Buckler said you yelled out—" and (2) "Would it surprise you that nowhere does Joey Buckler say anything about a robbery." *Bell,* 114 Md.App. at 498–99, 691 A.2d 233.

witness's veracity. Maryland Rules 5–613; 5–616. Moreover, Maryland Rule 5–616 permits, *inter alia*, impeachment by questioning of the witness directed toward "proving that the facts are not as testified to by the witness" or by showing bias, prejudice, motive to testify falsely, or lack of knowledge. In appropriate circumstances, extrinsic evidence may also be introduced to impeach the witness's credibility. Maryland Rule 5–616(b). "Evidence proved through another witness ... is extrinsic evidence. The admissibility of extrinsic evidence which is offered for substantive purposes is governed by all the usual rules of evidence: no special rule applies when the evidence has the incidental effect of discrediting a witness' testimony." McLain, *supra*, § 607.4, at 50. Yet the State has not referred us to any authority to support its claim that it was entitled to impeach the defendant with the hearsay statement of a material eyewitness who was not present at trial, whose unavailability was not established, and whose oral statement was neither tested in another proceeding, proffered as a sworn statement, nor adopted by the declarant. *Id.* at 497, 691 A.2d 233 (omission in original).

Recently, in *Sweetney v. State*, 423 Md. 610, 623–24, 33 A.3d 435 (2011), the Court of Appeals discussed *Bell*, stating:

In *Bell v. State*, 114 Md.App. 480, 691 A.2d 233 (1997), the Court of Special Appeals reversed manslaughter and attempted first degree murder convictions on the ground that the trial court should not have allowed the prosecutor to ask the appellant a series of "would it surprise you that" questions by which the State "succeeded in placing before the jury the written content of" a statement made to investigators by a person who did not testify at trial. *Id.* at 495, 691 A.2d at 240. While rejecting the State's argument that it was entitled to use the out-of-court statement for purposes of impeachment, the *Bell* Court stated:

Statements that are otherwise inadmissible are not salvaged by invoking the mantra of "impeachment." If the State could not properly use the statement under the applicable rules of evidence, we fail to see how it could,

instead, read the statement to the jury, apparently line by line, through the questions it posed to the defendant.

Unquestionably, a party may attempt to impeach a witness by challenging his or her credibility. . . . But impeachment must be consistent with the common law and the rules of evidence.

*Id.* at 496–97, 691 A.2d at 241. (Internal citation omitted). The Court stated, however, that:

The holdings in *Wiggins* [*v. State*, 602 A.2d 212, 90 Md.App. 549 (1992) ], *Bell*, and *Farewell* [*v. State*, 150 Md.App. 540, 822 A.2d 513 (2003) ] are entirely consistent with federal cases that hold as follows:

Under the Federal Rules of Evidence, a party may attempt to impeach a witness through evidence of character or conduct, of conviction of a crime, **or of prior inconsistent statements.** *See* Fed.R.Evid. 608, 609, 613. "[W]itnesses are not impeached by prior inconsistent statements of other witnesses, **but by their own prior inconsistent statements.**" *United States v. Tarantino*, 846 F.2d 1384, 1416, 269 U.S.App.D.C. 398 (D.C.Cir.1988).

*United States v. Wilson*, 720 F.Supp.2d 51, 66 (D.D.C.2010).

*Sweetney*, 423 Md. at 624–25, 33 A.3d 435 (emphasis added).

Returning to the instant case, we perceive no error in the prosecutor's questions.[9] Other than the prior testimony of

---

9. Appellant lodged an objection only to the prosecutor's questions regarding his prior statements to Smothers and Marshall, and has failed to ask this Court for plain error review. Maryland Rule 4–323(a) provides: "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Maryland Rule 8–131(a) provides: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" Reviewing an unpreserved issue is even more tenuous when the defendant fails to object at trial, and then, on appeal, fails to acknowledge the lack of objection or ask this Court to review for plain error. *See Garner v. State*, 183 Md.App. 122, 151–52, 960 A.2d 649 (2008), *aff'd*, 414 Md. 372, 995 A.2d 694 (2010) ("In that the appellant, strangely, does not even ask us to

Wise [10]—who testified at trial and whom appellant cross-examined—the only statements about which the prosecutor questioned appellant were inculpatory statements appellant allegedly made to Smothers and Marshall while in jail. Appellant contends that the circuit court erred in overruling his objection to the prosecutor's questions: "Remember telling [Smothers] how you stuck the gun up in there and started shooting in the ice cream truck?" and "You don't know Jonathan Marshall over in the jail? . . . you never said anything to him about I had to try my hand; you know me; you know how I get it, right? Talking about this murder, right?" By these questions, however, the prosecutor was attempting to elicit a prior inconsistent statement from appellant, using the process set forth in Rule 5–613(a). As it turned out, appellant denied making any such statements to Smothers or Marshall, so the prosecutor did not elicit a prior inconsistent statement from him.

Maryland Rule 5–616(a)(1) explicitly allows a party to impeach a witness with that witness's prior inconsistent statements. Appellant's contention that "the State used inadmissible hearsay declarations from unavailable witnesses in an attempt to impeach" him is without merit, as the prosecutor only questioned appellant as to any out-of-court statements he might have made to Smothers or Marshall. Appellant urges that the prosecution not be able to question a defendant about out-of-court statements the defendant allegedly made to a third party, unless the prosecution calls that third party at trial-whether the third party be a law enforcement officer, a witness, or any other person. Appellant contends that the State having gained knowledge of appellant's statements derivatively, via a third party, renders the statements hearsay.

At oral argument, the State argued, in essence, that Maryland Rule 5–616 contemplates the use of a defendant's own

---

overlook non-preservation, this contention may qualify as an instance of non-preservation squared.").

**10.** The prosecutor asked appellant, "But, now that's not what your father [Wise] said earlier, was it?"

prior inconsistent statements acquired by the prosecution from third parties to whom a defendant has made statements concerning a crime. We agree. To adopt appellant's contention would limit the prosecution to impeaching defendants, pursuant to Maryland Rule 5–616(a)(1), only with prior inconsistent statements defendants made to third parties when the third parties are called to testify at trial and the prior inconsistent statements are proven extrinsically, as opposed to intrinsically. This would abrogate the very basis and purpose of Maryland Rules 5–613(a) and 5–616, that is-to permit a party to examine a witness about an oral statement if the content and circumstances under which the statement is made, including the person to whom it was made, are disclosed, to attempt to elicit the statement directly from the witness himself.

In this case, the State questioned appellant concerning prior statements appellant allegedly made to Smothers and Marshall. Appellant was given an opportunity to admit, deny, or explain the statements. He denied making them. Thereafter, the State was permitted—although not required—to prove the statements through extrinsic evidence as contemplated by Maryland Rules 5–613 and 5–616. Here, the State chose to accept appellant's response and not call Smothers and Marshall to the stand as witnesses. That was proper and the State's choice to make. The result of that choice was that no prior inconsistent statement by appellant was proven, either intrinsically (through him) or extrinsically (through Smothers or Marshall). The circuit court did not err by permitting cross-examination of appellant as to his alleged out-of-court statements made to third parties.

We find no merit in appellant's contention that *Bell* is dispositive because the prosecutor in *Bell,* in the midst of asking a series of "would it surprise you questions," asked: "How about this one that when you get back to the house, Cory Tart's house, after you have shot Chris and Bryan Maxwell you say 'Those b[ ] aren't going to be calling us b[ ]

anymore?'" *Id.* at 489, 691 A.2d 233. The argument is unpersuasive as the error found by this Court in *Bell* concerned the use of the "would it surprise you" questions. In *Bell*, we identified the use of Buckler's out-of-court statements to cross-examine Bell as the impermissible form of questioning, not the question regarding Bell's out-of-court statement to Tart. *Id.* at 497, 691 A.2d 233. Nowhere in this Court's analysis in *Bell*, did we determine that the State is precluded from asking a defendant in a criminal case whether he made out-of-court inculpatory statements that a third party claims he made. It is axiomatic that the State will learn of the defendant's alleged out-of-court statements from other people. We shall not hold that where the defendant is confronted with his own alleged out-of-court inculpatory statements, which the State learned of from a third party, the State must call the third party as a witness at trial to establish that the out-of-court statements were made. If the defendant denies making the statements, and the third party is not called as a witness, the State is bound by that testimony, in that no prior inconsistent statement is proven through the defendant. If, however, the State wants to pursue calling the third party to testify that the defendant made the statement to him, the State can do so. It is not required to do so, however.[11]

---

11. There has been no contention in this case that the prosecutor lacked a good faith belief in the factual predicate for the questions as to Smothers and Marshall. *See Elmer v. State*, 353 Md. 1, 14–15, 724 A.2d 625 (1999) (The Court of Appeals held that the trial court improperly permitted a prosecutor's questions because "the prosecutor's questions [to a co-defendant] suggested the existence of facts which he could not prove, and indeed, after [a] bench conference, he *knew* he could not prove.... [T]he prosecutor lacked a good faith belief in the factual predicate implied in the question."); *Walker v. State*, 373 Md. 360, 400–01, 818 A.2d 1078 (2003) (Where the prosecutor made improper assertions of personal knowledge on examination of her own witness and the defendant objected, the Court of Appeals, quoting *Elmer*, stated that "a prosecutor may not ask a question 'which implies a factual predicate which the examiner knows he cannot support by evidence....'") (Quoting *Elmer*, 353 Md. at 13, 724 A.2d 625 (quoting *United States v. Elizondo*, 920 F.2d 1308, 1313 (7th Cir.1990))). Nothing in this opinion encroaches upon the Court of Appeals's holdings in *Elmer* and *Walker*.

### III.

### A.

■ Appellant contends that he was deprived of the right to a fair trial because the circuit court erred in allowing Woodland to testify erroneously that she told the prosecutor before the first trial that she could identify the shooter, before her testimony was corrected by a stipulation. Appellant argues that "[t]he State improperly relied on [Woodland's] perjured testimony to secure a conviction against the Appellant."

In contrast, the State maintains that it "consistently took the position that Woodland was either confused by [appellant's] counsel's cross-examination or simply mis-recollected the precise time." The State argues that "the prosecutor's closing argument never cited much less relied on Woodland's claim to have been able [to] identify [appellant] before the first trial, an assertion with which the prosecutor personally disagreed and, for that reason, agreed to the stipulation."

In *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (Citations omitted).

We find no merit in appellant's allegation that the State relied on perjured testimony to secure the conviction. Rather than ever suggesting that Woodland committed perjury, the circuit court found that Woodland was simply "confused." As mandated by *Napue,* 360 U.S. at 269, 79 S.Ct. 1173, the circuit court did not "allow[ false testimony] to go uncorrected"; instead, the circuit court corrected any error by reading a stipulation that appellant's first trial was the first time that Woodland said that she was able to identify appellant. We, therefore, conclude that the State did not use "perjured" testimony and that the circuit court properly corrected the testimony.

## B.

■ Appellant contends the State improperly questioned him in a manner that permitted a negative inference to be drawn from his invocation of the right to remain silent. Appellant argues that the prosecutor impermissibly referred to his right to remain silent by asking on cross-examination "is [this] the first time you've ever said anything publically to anybody about this meeting you had with Deante Duckett the next day, right?" Appellant argues that the State implied to the jury that he asserted his right to remain silent when asked about facts that would be "arguably inculpatory."

In contrast, the State responds that appellant was confronted during custodial interrogation with this direct accusation long before he invoked the right to remain silent, *i.e.* that the Detective asked appellant what occurred with Duckett well prior to his invocation of the right to remain silent.

In *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court explained that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." In *Griffin*, the Supreme Court reversed where the prosecutor argued in closing that the victim "is dead, she can't tell you her side of the story. The defendant won't." *Id.* at 611–12, 85 S.Ct. 1229.

In *Marshall v. State*, 415 Md. 248, 261, 999 A.2d 1029 (2010), the Court of Appeals stated that "the federal constitutional right against compelled self-incrimination prohibits prosecutorial comment on the accused's silence or failure to testify." (Quoting *Smith v. State*, 367 Md. 348, 353, 787 A.2d 152 (2001)). The Court held that the prosecutor improperly argued in closing: "There are several pieces we don't have. *We don't have [the defendant]'s thoughts* [.]" *Marshall*, 415 Md. at 256–57, 999 A.2d 1029 (emphasis in original). Similarly, in *Smith*, 367 Md. at 352, 358, 787 A.2d 152, the Court of Appeals held that the prosecutor improperly argued in closing: *"What explanation has been given to us by the defendant* for having the leather goods? Zero, none." (Emphasis in original).

Returning to the instant case, we conclude that the issue is not preserved for appeal. The prosecutor cross-examined appellant about whether he had previously mentioned his meeting with Duckett. Appellant's counsel objected prior to a response being given to the question and the State rephrased the question to ask whether appellant told Detective Elliott about his meeting with Duckett, and, notably, appellant's counsel did not object. Appellant responded: "Yes, I told him." As with the hearsay issue discussed above, appellant fails either to acknowledge that appellant's counsel did not object or to ask this Court to review for plain error. Thus, this is a yet another instance of "non-preservation squared." *Garner*, 183 Md.App. at 152, 960 A.2d 649.

■ Alternatively, we are satisfied that the prosecutor's questions did not constitute an impermissible reference to appellant's right to remain silent. Appellant never answered the original question to which appellant's counsel lodged an objection. The circuit court properly instructed the jury that questions are not evidence, and that the jury could not speculate about possible answers. The circuit court allowed the prosecutor to rephrase the question and appellant's counsel offered no further objection. In response to the rephrased question, appellant responded that he had told Detective Elliott about Duckett. Thus, the testimony was not that appellant invoked his right to remain silent. Although the prosecutor asked whether appellant had previously spoken publicly about Duckett's alleged part in the offense or told Detective Elliott of Duckett's role, appellant failed to establish that the questions: (1) occurred after his request for an attorney, or (2) that in response to the questions, appellant invoked the right to remain silent. For the reasons stated above, we assign no error to the questions.

## IV.

Appellant argues that the circuit court erred in allowing the prosecutor to make improper remarks during closing argument and rebuttal closing argument.

In contrast, the State maintains that by not objecting at trial appellant failed to preserve these issues for appellate review. The State argues that, even "[i]f reviewed for plain error, the circuit court soundly exercised its discretion to regulate the prosecutors' closing argument."

In *McFadden v. State*, 197 Md.App. 238, 255, 13 A.3d 68 (2011), this Court explained: "The regulation of argument rests within the sound discretion of the trial court." (Quoting *Grandison v. State*, 341 Md. 175, 224, 670 A.2d 398 (1995)). In *Mitchell v. State*, 408 Md. 368, 380, 969 A.2d 989 (2009), the Court of Appeals explained the latitude that counsel enjoys during closing arguments:

> As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way.... Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the prosecution produces.

(Citation omitted). "Further, counsel may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions." *McFadden*, 197 Md.App. at 255, 13 A.3d 68 (citations and internal quotation marks omitted) (alteration in original).

## A. Preservation

██ The record reveals that appellant failed to lodge any objection whatsoever during the State's closing argument and failed to object to the comments at issue in this appeal during

the State's rebuttal closing argument. As such, any issue as to the prosecutor's remarks is not preserved for appellate review. Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."); *Conner v. State,* 34 Md.App. 124, 135, 366 A.2d 385 (1976) ("A failure to object [to a prosecutor's statements during closing arguments] and to request the Court's correction is a waiver of the contention for appellate review.").

Alternatively, we conclude the prosecutor's comments failed to rise to the extreme level of impropriety warranting reversal. In *Spain v. State,* 386 Md. 145, 159, 872 A.2d 25 (2005), the Court of Appeals discussed the factors that appellate courts may consider:

> When assessing whether reversible error occurs when improper statements are made during closing argument, a reviewing court may consider several factors, including the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused.

(Citing *United States v. Melendez,* 57 F.3d 238, 241 (2d Cir.1995)). In addition to the factors described above, appellate courts may consider whether a prosecutor's remark during closing arguments "was an isolated event that did not pervade the entire trial." *Spain,* 386 Md. at 159, 872 A.2d 25 (citation omitted).

## B. Prosecutors' Remarks on Witnesses' Credibility

In *Curry v. State,* 54 Md.App. 250, 255, 258, 458 A.2d 474 (1983), this Court held that, despite the fact that the defendant failed to object, a prosecutor made improper remarks about witnesses' credibility. The prosecutor argued in closing:

> [T]he prosecutor represented to the jury that the two youthful witnesses, upon whom he relied to establish the connection between the defendants and the decedent, had no "criminal" records. That representation was true so far as it went. Malcolm, as we have seen, had a juvenile

record, while Tracy, although charged with assault, had not, at the time the statement was made been convicted of any crime. Because the prosecutor's statement about the two youths was verisimilar, it was most certainly, under the circumstances of the instant case, deceiving to the jury. Moreover, characterization of the two witnesses as having lived "exemplary" lives was a gross misstatement of fact designed to evince the trustworthiness of the witnesses and thus bolster the State's circumstantial case.

(Citation omitted).

In *Spain*, 386 Md. at 159, 872 A.2d 25, the Court of Appeals held that the following remark during the State's closing argument, made over the defendant's objection, "was an isolated event that did not pervade the entire trial":

The second point I wanted to make to you is that the Officer in this case—the Defense's argument is that Mr. Spain was outside his house. He was going to attend a Superbowl party and was buying beer. Part of what you have to determine is the credibility of the witnesses. The defense put on a witness who testified, and the State put on one witness, the Officer in this case. You have to weigh the credibility of each individual. Who has a motive to tell you the truth. The Officer in this case would have to engage in a lot of lying, in a lot of deception and a conspiracy of his own to come in here and tell you that what happened was not true. He would have to risk everything he has worked for. He would have to perjure himself on the stand.

*Id.* at 151, 872 A.2d 25. The Court stated:

Attorneys . . . feel compelled frequently to comment on the motives, or absence thereof, that a witness may have for testifying in a particular way, so long as those conclusions may be inferred from the evidence introduced and admitted at trial. . . . [W]here a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching[.]

. . .

The prosecutor's invitation for the jury to consider whether the officer had a motive to lie did not amount to improper vouching because the comments did not express any personal belief or assurance on the part of the prosecutor as to the credibility of the officer. Nor did such comments, in isolation, explicitly invoke the prestige or office of the State or the particular police department or unit involved.

. . .

More importantly, however, before jury deliberations began, the trial judge gave, among others, a jury instruction, based on Maryland Criminal Pattern Jury Instructions § 3:10, that emphasized the argumentative nature of closing arguments, and explicitly instructed the jurors as to relevant factors to consider and their roles as the sole judges of the credibility of the witnesses presented at trial. Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary.

*Id.* at 155–56, 160, 872 A.2d 25 (citations and internal quotation marks omitted).

In contrast, in *Sivells v. State,* 196 Md.App. 254, 275–76, 280, 9 A.3d 123 (2010), *cert. dismissed,* 421 Md. 659, 28 A.3d 704 (2011), this Court held that, over the defendant's objection, a prosecutor made improper remarks about the credibility of law enforcement officers, who were the only witnesses against the defendant. The prosecutor had argued in closing: "Especially two veterans who have a lot to loose [sic] by making things up, pensions, credibility, livelihood. Everything to loose [sic] and nothing to gain. Not one thing to gain by it." *Id.* at 275, 9 A.3d 123. The prosecutor's remarks were improper because "there was no evidence to support the prosecutor's statement that the police would lose their pensions or their livelihood if they 'made things up.' " *Id.* at 280, 9 A.3d 123.

■ In this case, the prosecutor's remarks—that Woodland "is not going to forget the face of the man who killed her only child," that "you cannot disbelieve" Woodland and Butler, and that Woodland and Butler "want to get it right"—were not improper. The prosecutor based the remarks on facts in evidence: Woodland lost her daughter, and Butler lost a girl she considered a "niece." Under the circumstances, the two eyewitnesses were likely to have stark, vivid memories of the event. This is commonsensical, and did not require "expert testimony" as appellant argued. The instant situation is unlike *Sivells*, 196 Md.App. at 280, 9 A.3d 123 a case in which the prosecutor argued a witness's credibility based on a fact not in evidence—that the law enforcement witness would lose his pension for lying on the stand.

■ Similarly, we conclude that the prosecutor's remark that the law enforcement witness would have had to "conspir[e] with the witnesses, [and] with me the State, all the police" was not improper. Again, the prosecutor made no mention of facts not in evidence and the remark was neither inflammatory nor depreciative of the defense.

### C.  Burden–Shifting During State's Closing Arguments

■ In *Lawson v. State*, 389 Md. 570, 596, 886 A.2d 876 (2005), the Court of Appeals held that the State improperly shifted the burden to the defendant by arguing that the defendant had offered no evidence that the victim had a motive to lie. The error merited a new trial because "[t]he primary evidence in this case was provided directly or indirectly by the victim's statements[.]" *Id.*

In contrast, in *Wise v. State*, 132 Md.App. 127, 139, 145, 751 A.2d 24, *cert. denied*, 360 Md. 276, 757 A.2d 811 (2000), this Court held that the prosecutor's remarks during closing argument were not improper when the prosecutor argued:

> I'm going to ask you not to speculate, not to speculate because that's what he's going to ask you, because the defense didn't produce a witness.

There's no evidence that the defendant was waiting for a bus. Where did you hear that? You heard that in [the defendant's counsel's] opening statement which the judge just told you is not any more evidence than mine.

Nobody got on the stand and testified to that.

(Emphasis omitted). We held that the comments were proper because "[t]he prosecutor's closing argument was drawing attention to the fact that defense counsel had failed to fulfill his prediction in opening statement as to what he would develop at trial." *Id.* at 145, 751 A.2d 24.

In this case, it is apparent that the prosecutor's remark about appellant's hat did not improperly shift the burden of proof to appellant. Prior to closing arguments, the circuit court instructed the jury on the State's burden of proof, and the prosecutor prefaced his remarks with a reminder that appellant need not prove anything. Both appellant and Duckett testified that appellant had been wearing a Chicago Bulls hat on June 29, 2007. Given that appellant testified that he was wearing a Chicago Bulls hat at the scene on the night of the shooting, the prosecutor was entitled to bring up that the hat was neither found at the crime scene, nor in evidence at trial.

### D. Appealing to Juries' Fears During State's Closing Arguments

In *Lawson*, 389 Md. at 596–97, 886 A.2d 876, the Court of Appeals held that the following remarks by the prosecutor during closing argument improperly appealed to the jury's fears:

"What does a monster look like? Looks like different things to different people. What does a sexual molester look like? He looks like someone you know. He looks like your uncle, your brother, your sister, your cousin. It's possible. But there is no certain way that someone who molests children looks. But they do ingratiate themselves. They make themselves indispensable. They are friendly, always there to watch.

"Not everyone is like that, but please don't misunderstand me because the important point here is that a child molester looks like anybody else. That's why they are able to do what they do, because they look like all of us, and we trust."

"[A]lthough the prosecutor did not say 'this defendant' is a monster and a child molester, it is clear that she intended to imply to the jury that he was that monster and child molester." *Id.* at 599, 886 A.2d 876.

In this case, the prosecutor's remarks were aimed at validating Irby's testimony about appellant having admitted that he shot a moving ice cream truck. After hearing all of the testimony, the jury was fully aware that the situation that the prosecutor hypothesized—a stopped ice cream truck surrounded by children—was not the circumstance under which the offense took place. Under the circumstances in this case, we discern neither an appeal to the jury's fears nor unfair prejudice.

### E. Remarks on Appellant's Counsel and Appellant's Counsel's Arguments

We conclude the prosecutor's remarks as to appellant's counsel and appellant's counsel's arguments were not improper. The prosecutor's calling appellant's counsel's arguments "red herrings" was "oratorical conceit or flourish" that was well within the wide latitude granted to counsel in summation. *McFadden,* 197 Md.App. at 255, 13 A.3d 68 (citation omitted). As to the prosecutor's use of the word "idiot," the prosecutor made the following remark:

I sit there and listen to [appellant's counsel's] arguments and the first thing that comes up to me is unbelievable that he can actually stand there and say the things that he did like this is no robbery; can't believe it.

A lot of sound and fury. I'm sure you've heard that phrase before. Well, that's actually from a quote. It's from Shakespeare, from Macbeth, and the full quote is: It is a tale ... and I'm quoting now ... it is a tale told by an idiot full of sound and fury signifying nothing. That's what the

entire argument by [appellant's counsel] was. Didn't mean a thing. Means nada. Nothing. Not a dag on thing.

He stood up here in front of you on several occasions and said that if the forensic evidence . . . if this fingerprint doesn't show this, this fingerprint doesn't show that you have to find [appellant] not guilty.

At oral argument, appellant's counsel contended that the use of the term "idiot" denigrated the role of defense counsel and was inappropriate. To begin, we note that appellant's counsel failed to lodge any objection to this remark. Appellant's counsel's failure to object undermines the argument that this remark was utterly improper and offensive, and it also causes the issue to not be preserved for appellate review. As noted by Judge Charles E. Moylan, Jr., speaking for this Court, the purpose of objections "to preserve the issue for appellate review is not an arbitrary one. It is supported by a solid rationale. At the most basic level, it recognizes that appellate courts do not range forth, like knights errant, seeking flaws in trials. Their quest is far more modest. They monitor a trial for the limited purpose of seeing if the trial judge committed error." *Austin v. State,* 90 Md.App. 254, 264–65, 600 A.2d 1142 (1992) (citations omitted).

In addition to the lack of an objection, reading the remark in context, the prosecutor argued that appellant's counsel's contention that no robbery occurred was "sound and fury." The prosecutor sought to rebut appellant's counsel's contention that no robbery took place, rather than argue that appellant's counsel was an "idiot."

During closing argument, appellant's counsel argued that: "I don't think you should be convinced that a robbery occurred as they said it occurred." "Now, that doesn't mean they weren't robbed. I just said to you that I don't . . . I can't believe beyond a reasonable doubt that they [Woodland and Butler] were robbed, but rather none of us should because they're not telling the truth, the whole truth. They . . . they go over there and they say that they stopped to fix the

mirrors. Why aren't Charlene Woodland's fingerprints on the mirrors?"

During the State's rebuttal closing argument, the prosecutor stated: "I sit there and listen to [appellant's counsel's] arguments and the first thing that comes up to me is unbelievable that he can actually stand there and say the things that he did like this is no robbery. . . . A lot of sound and fury. I'm sure you've heard that phrase before. Well, that's actually from a quote . . . . the full quote is: It is a tale . . . and I'm quoting now . . . it is a tale told by an idiot full of sound and fury signifying nothing." Whether a prosecutor has exceeded the limits of permissible comment depends upon the facts of each case. *Spain*, 386 Md. at 158, 872 A.2d 25. In this case, given the prosecutor's obvious attempt to rebut appellant's counsel's contention that no robbery occurred, we perceive no error warranting reversal.

### F. Cumulative Prejudice from Improper Remarks During Closing Arguments

In this case, having examined the severity of the alleged improper remarks and determined that the remarks in isolation do not warrant reversal, we conclude that the remarks by the prosecutor do not cumulatively rise to the level of prejudice requiring reversal. The prosecutor's remarks, whether taken individually or as a whole, were not so improper that they tainted the results of a trial in which there were three eyewitnesses against appellant-Woodland, Butler, and Deante Duckett—as well as the witness—Irby—who testified that appellant admitted shooting at the ice cream truck. As to the weight of the evidence against the accused, in our view, this was a strong case in which the evidence weighed heavily in the State's favor. This was not a close case, of the "he said, she said" variety that turned primarily on the credibility of one witness.

Any prejudicial effect of the State's remarks was diminished by the instructions given by the circuit court prior to closing argument, the number of witnesses, and the overall weight of the evidence against appellant. As in *Spain*, 386 Md. at 160,

872 A.2d 25, before closing arguments, the circuit court properly instructed the jury that closing arguments were not evidence. Consequently, upon balancing the factors identified in *Spain*, we are satisfied that the State's remarks in relation to the totality of the evidence did not rise to the level of having misled or influenced the jury to the prejudice of the defendant, and do not constitute plain error.

**JUDGMENTS OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**